# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, | : | | |
| | : | | |
| Petitioner & Counter-Defendant, | : | Civil Action No.: | 12-136 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 13, 14 |
| | : | | |
| LOCAL 2, OFFICE AND PROFESSIONAL EMPLOYEES INTERNATIONAL UNION, AFL-CIO, | : | | |
| | : | | |
| Respondent & Counter-Claimant. | : | | |

## MEMORANDUM OPINION

**GRANTING IN PART AND DENYING IN PART RESPONDENT'S MOTION TO DISMISS; AND GRANTING IN PART AND DENYING IN PART PETITIONER'S MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

This matter comes before the Court following the parties' negotiation impasse and subsequent arbitration over the terms of a collective bargaining agreement.  The petitioner is a local, public mass transit authority formed pursuant to an interstate compact; the respondent is a union of approximately 700 of the petitioner's employees.  After an extensive arbitration process spanning over one year and a record of more than 400 exhibits, the three-member arbitration board issued an award that included, among other things, general wage increases, new subcontracting terms, and new pay bands.  The transit authority filed a petition in this Court seeking vacatur of three award provisions, and the union filed a counterclaim seeking confirmation of the entire award.  The parties have each filed motions to dispose of the case in their favor.  For the reasons discussed below, the Court will vacate the award's peopling of the new pay bands and confirm the remainder of the award.

## II.  FACTUAL BACKGROUND

### A.  The Parties and the Compact

Petitioner, the Washington Metropolitan Area Transit Authority ("WMATA" or the "Authority"), is a mass transit facilitator in the Washington metropolitan area that operates the Metrorail, Metrobus, and MetroAccess transportation services.  WMATA was established as the result of an interstate compact (the "Compact") between the State of Maryland, the District of Columbia, and the Commonwealth of Virginia in order to provide a coordinated approach to transportation, growth, and development in the D.C. area.  *See generally* Act of Nov. 6, 1966, Pub. L. No. 89-774, 80 Stat. 1324 (codified as amended at Md. Code Ann., Transp. § 10-204 (Michie 2008), D.C. Code §§ 9-1103.01 to .02, 9-1107.01 (2001), and Va. Code Ann. §§ 56-529 to 56-530 (2003)) (granting congressional consent for the Compact).[1]  It operates within the District of Columbia and various counties and cities within Maryland and Virginia (collectively with the federal government, the "Compact Jurisdictions").

The Compact sets forth WMATA's powers and responsibilities.  With respect to financing, the Compact provides that "as far as possible, the payment of all costs shall be borne by the persons using or benefiting from the Authority's facilities and services . . . ."  Compact § 16.  Any remaining costs are to be "equitably shared" among the Compact Jurisdictions, with the allocation "determined by agreement among them . . . ."  *Id.*  Evidence put forward by WMATA suggests that, under this funding paradigm, the Authority uses complex formulas to determine the amount each Compact Jurisdiction should contribute.  *See* J.A. 511 (Arb. Tr. 1238:20–1239:20, July 16, 2010).  In recent years, subsidies from the Compact Jurisdictions

---

[1] All citations to the "Compact" in this Memorandum Opinion refer to the corresponding section(s) of the current Compact, codified as amended at the above-listed sections of the signatory jurisdictions' codes.

have provided about 40 percent of the revenue for WMATA's operating budget. *See, e.g.*, J.A. 5356 (FY2009). WMATA's infrastructure is supported by a separate budget, known as the capital budget. *See, e.g.*, Compact § 23; J.A. 211 (Arb. Tr. 539:1–540:1, July 12, 2010).

In addition to setting guidelines regarding WMATA's financing, the Compact also authorizes the Authority to exercise certain enumerated powers, including the ability to construct, acquire, and sell real property; enter into and perform contracts; create and abolish offices, employments, and positions; contract for or employ professional services; and hold public hearings. *See* Compact § 12. The Compact also recognizes the role of labor unions and requires the Authority to negotiate with such unions regarding "wages, salaries, hours, working conditions, and pension or retirement provisions." *Id.* § 66(b). Where negotiation of any "labor dispute" does not result in a collective bargaining agreement ("CBA"), the parties must submit the dispute to arbitration in which a three-member arbitration panel sets the terms to be included in the CBA. *See id.* § 66(c). The arbitration process also applies to the interpretation or application of existing CBAs. *See id.*

The Office and Professional Employees International Union, Local 2 ("Local 2" or the "Union") is a labor union of WMATA employees whose job responsibilities encompass a variety of professional technical, clerical, and administrative duties, including engineering, inspection, and communications. *See generally* J.A. 3 (Arb. Tr. 9:19–21, July 8, 2010); J.A. 1225–31. The approximately 709 Local 2 members comprise about 7 percent of WMATA's total workforce. *See* J.A. 3810. Local 2 is an affiliate of the American Federation of Labor and Congress of Industrial Organizations. *See* Pet. Vacate Arb. Award ¶ 3, ECF No. 1.

## B. Collective Bargaining

The most recent CBA between WMATA and Local 2 expired on June 30, 2008. *See* J.A. 1052. As that CBA came to an end, the parties began the negotiations for the next contract but made little progress. *See* J.A. 3 (Arb. Tr. 11:1–5, July 8, 2010). In May 2010, nearly two years after the prior CBA had expired, the parties submitted their final offers to arbitration under the terms of the Compact. *See* J.A. 1181–200.

### 1. The Kasher Arbitration (Local 689)

Before engaging in negotiations with Local 2, WMATA bargained with the Amalgamated Transit Union Local 689 ("Local 689"), whose CBA had also expired on June 30, 2008. *See WMATA v. Local 689, Amalgamated Transit Union* (*Local 689 I*), 818 F. Supp. 2d 888, 892 (D. Md. 2011). Local 689 is the largest WMATA employee labor union, representing approximately 7,700 employees comprising about 70 percent of WMATA's workforce. *See id.* Due to similarities between WMATA's bargaining history with Local 689 and its bargaining with Local 2, the Court finds it appropriate to begin with a discussion of the Local 689 negotiations, which, like the instant case, resulted in arbitration under the Compact and judicial review in federal court.

After WMATA's negotiations with Local 689 reached an impasse in August 2008, the parties submitted the dispute to arbitration pursuant to the Compact. The arbitration board was composed of three members: Thomas R. Roth as Local 689's representative, R. Theodore Clark, Jr. as WMATA's representative, and Richard R. Kasher as Neutral Chairman (collectively, the "Kasher Board"). *See id.* On November 4, 2009, the Kasher Board issued its award (the "Kasher Award"), which included the following general wage adjustments: "a 2 percent lump-sum payment effective July 1, 2008; and annual 3 percent general wage increases effective on

July 1 in the years 2009, 2010, and 2011." *Id.* at 892–93. The two partisan board members each issued partially dissenting opinions. *See id.* at 893.

Shortly after the Kasher Award was issued, the parties filed suit in the U.S. District Court for the District of Maryland—Local 689 seeking judicial confirmation of the Kasher Award, and WMATA seeking an order vacating the award's provisions for general wage adjustments and pension benefits. *See id.* WMATA's challenge was based on the Kasher Award's alleged failure to comply with the National Capital Area Interest Arbitration Standards Act of 1995, tit. IV, Pub. L. No. 104-50, 109 Stat. 463 (codified as amended at 40 U.S.C. §§ 18301–04 (2006)) (the "Standards Act" or the "Act"), which had never been applied by any court but purportedly sets forth procedures governing interest arbitrations between WMATA and its unionized employees. *See Local 689 I*, 818 F. Supp. 2d at 893–94. On cross-motions for summary judgment, Judge Peter J. Messitte remanded the award to the arbitration board with instructions to issue a supplemental opinion based on his preliminary conclusion that, whatever the Standards Act requires, the Kasher Award did not demonstrate full compliance with the Act. *See id.* at 893–94 & n.4. The written award "merely declared that the Neutral Chairman had 'given full and thorough consideration to the criteria' outlined in the Standards Act, but failed to provide any discussion or analysis applying the statutory factors to the evidence in the record." *Id.* at 893.

The Neutral Chairman issued an 8-page supplemental opinion on June 22, 2010. "Although [it] contained a brief additional discussion of the various statutory factors outlined in the Standards Act, like its predecessor it contained no detailed analysis of those factors, nor did it provide a roadmap that might direct the Court to the specific evidence the [Kasher] Board had considered and weighed in reaching its conclusions." *Id.* at 894. After setting forth his detailed interpretation of the Standards Act's requirements and finding that the supplemental opinion did

not comply, Judge Messitte again remanded the award to the Kasher Board with instructions to issue a further supplemental opinion. *See id.* at 906–08. The Neutral Chairman submitted a second supplemental opinion that this time mapped the submitted evidence to his conclusions, and upon renewed cross-motions for summary judgment the Maryland court upheld the Kasher Award. *See WMATA v. Local 689, Amalgamated Transit Union* (*Local 689 II*), 804 F. Supp. 2d 457, 476–79 (D. Md. 2011).

### 2. The Moffett Arbitration (Local 2)

After the negotiations between WMATA and Local 2 reached an impasse, the parties established an arbitration panel pursuant to the Compact. The arbitration board was composed of three members: Thomas R. Roth as Local 2's representative, Robert G. Ames as WMATA's representative, and Kenneth E. Moffett as Neutral Chairman (collectively, the "Moffett Board" or the "Board").[2] *See* Pet. Vacate Arb. Award ¶ 20, ECF No. 1. The proceedings generated a large arbitral record, including more than 400 exhibits and over 2,300 pages of transcript. *See id.* ¶ 22.

After 11 days of hearings, the Board met for several days of executive session. On January 13, 2012, the Board issued a 28-page written award (the "Moffett Award" or the "Award") outlining the awarded CBA terms and the reasoning for the Board's decision, and WMATA's partisan board member submitted an opinion dissenting in part. The Award touches upon many topics, but for purposes of this litigation its most disputed terms relate to general

---

[2] The partisan nature of the arbitration process cannot be understated. Mr. Roth sat on both the Kasher and Moffett Boards, and his law firm appeared as counsel of record presenting labor's case before both arbitral boards, Local 689's case before the District of Maryland, and Local 2's case before this Court. Similarly, Mr. Ames sat on the Moffett Board and appeared as counsel of record for WMATA before both arbitral boards, the District of Maryland, and this Court.

wage adjustments, subcontracting, and new pay bands. The Award provides for the following general wage adjustment:

> Effective July 1, 2008—2% lump sum payment
>
> Effective July 1, 2009—3% general wage increase
>
> Effective July 1, 2010—3% general wage increase
>
> Effective July 1, 2011—3% general wage increase

Award at 6 (footnote omitted).[3] The awarded subcontracting terms disallow the subcontracting of work customarily performed by the Union if it would result in the layoff or reduction in compensation of a Local 2 member, and the new terms also require the formation of a joint labor–management committee to review current and future subcontracting practices and seek to bring work in-house on a cost-neutral basis. *See id.* at 26. With respect to pay bands, the Board awarded terms establishing two new bands comprising the highest pay grades. *See id.* at 27. Under the Award, these new bands are to be occupied by Local 2 members whose compensation has been "red circled" at salaries above the previously highest pay grade.[4] *See id.*

Shortly after the Moffett Award became binding on the parties, WMATA petitioned this Court for judicial review of the Award pursuant to section 18304 of the Standards Act. *See* 40 U.S.C. § 18304(c) (2006). Specifically, WMATA asks the Court to vacate the general wage adjustments (and resulting pension benefit increase), the new subcontracting provisions, and the new pay band provisions. *See* Pet. Vacate Arb. Award ¶ 1, ECF No. 1. The petition is based on

---

[3] All citations to the "Award" in this Memorandum Opinion refer to the Moffett Board's written opinion, which was attached as Exhibit A to WMATA's petition (ECF No. 1).

[4] Such employees came about as a result of the earlier "Wolf" award, in which an arbitrator had determined that these employees were performing Local 2 work and should be placed within the bargaining unit. *See* Award at 27. Of these employees, those who were already compensated at salaries above the then-highest pay grade were "red circled"—that is, they continued to receive their higher salaries but would not receive increases or be assigned to a Local 2 pay band.

three grounds:  (1) that the Moffett Board failed to comply with section 18303 of the Standards

Act; (2) that the Board's decision was arbitrary or capricious; and (3) that the Board exceeded its

authority in granting the Award.  *See id.* ¶¶ 40–45.  Local 2 filed a counterclaim seeking

confirmation of the entire Moffett Award.  *See* Answer & Countercl., ECF No. 5.

On April 16, 2012, the parties filed cross-motions to dispose of this case.  Local 2's

motion to dismiss[5] seeks confirmation of the entire Moffett Award, interest, and attorneys' fees;[6]

WMATA's motion for summary judgment seeks vacatur of the Award's three challenged

provisions.  The parties agree that "resolution of these motions should settle all issues remaining

in this case."  Joint Status Rep. 2, ECF No. 18.

## III.  COLLATERAL ESTOPPEL

Local 2 asserts that WMATA is collaterally estopped from challenging the validity of the

wage increases awarded to Local 2 unit members, including a 2 percent lump sum in 2008 and

annual 3 percent increases in 2009, 2010, and 2011, because the same increases were awarded to

---

[5] Local 2 has styled its motion as a motion to dismiss, but the Court will evaluate the
parties' dispositive motions as cross-motions for summary judgment.  In the context of
challenges to agency actions, "there is no real distinction . . . between the question presented on a
12(b)(6) motion and a motion for summary judgment[,]" *Marshall Cnty. Health Care Auth. v.
Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993), but the D.C. Circuit has nonetheless suggested
that "[i]t is probably the better practice for a district court always to convert to summary
judgment" in such cases.  *Id.* at 1226 n.5.  Although the instant case is not a challenge to an
agency action, the limitation of this litigation to the arbitral record similarly requires the district
court to "sit[] as an appellate tribunal."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083
(D.C. Cir. 2001).  "The entire case on review is a question of law, and only a question of law."
*Marshall Cnty. Health Care Auth.*, 988 F.2d at 1226.  The Court will therefore consider Local
2's motion a motion for summary judgment pursuant to Federal Rule of Civil Procedure 12(d).

[6] Local 2's motion also raises a Tenth Amendment challenge to the Standards Act.  *See*
Resp't's Mem. Supp. Mot. Dismiss Pet. & Conf. Arb. Award 12–20, ECF No. 13-1.  The
constitutional challenge was certified to the Attorney General pursuant to 28 U.S.C. § 2403(a)
and Federal Rule of Civil Procedure 5.1.  *See* Order, ECF No. 19.  The United States has not yet
intervened, but the Court granted its request for an extension of time to do so.  *See* Mot. Ext.
Time, ECF No. 20.

Local 689 in the Kasher Award and upheld by the Maryland court. Resp't's Reply Mem. Supp. Conf. Arb. Award 5–10, ECF No. 17. Because the argument was raised in response, WMATA did not have an opportunity to address it. Collateral estoppel is a threshold issue, *see Graphic Commc'ns Int'l Union, Local 554 v. Salem–Gravure Div. of World Color Press, Inc.*, 843 F.2d 1490, 1493 (D.C. Cir. 1988), and so the Court will address it at the outset.

"Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (citing *Montana v. United States*, 440 U.S. 147, 153 (1979)). For collateral estoppel to apply, (1) the issue being raised must have been contested by the parties and submitted for adjudication in the prior case, (2) the issue must have been actually and necessarily determined by a court of competent jurisdiction, and (3) preclusion in the second case must not work a basic unfairness to the party bound by the first determination. *See Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992). For example, in a case between two unions contesting whether parties could submit to a tripartite arbitration instead of the contractually required bipartite arbitration, the D.C. Circuit found the issue to be collaterally estopped by a Ninth Circuit opinion since the court was asked by the "same three parties" to interpret the "same CBA" on the same issue. *Nat'l Post Office Mail Handlers Div. of the Laborers' Int'l Union v. Am. Postal Workers Union*, 907 F.2d 190, 192 (D.C. Cir. 1990).

This suit fails the first factor of the test for collateral estoppel because the issue raised by WMATA in this suit—namely, whether the Moffett Board's arbitration award was arbitrary and capricious in its award of wage increases to Local 2—was not raised before the Maryland court. *See generally Local 689 II*, 804 F. Supp. 2d. That court was asked to review the Kasher Award

for compliance with the Standards Act, not to reweigh the evidence for itself and find that

WMATA could, in fact, afford to pay the awarded wage increases. *See id.* at 477. Moreover, in

reviewing the Kasher Award, the Maryland court reviewed an arbitral record and opinion that

was specific to Local 689 and encompassed party-specific factors, including the union's

compensation as compared to others who employ similar services in the D.C. area, and the

special nature of the bargaining unit's work. *Id.* at 475; *see also* 40 U.S.C. § 18303(b) (2006).

Though the court found that the Kasher Board did comply with the Standards Act when

awarding the wage increases, the court's review was specific to the "7,700 bus drivers, train

operators, mechanics and other staff" comprising Local 689, Resp't's Mem. Supp. Mot. Dismiss

5, ECF No. 13-1, and does not speak directly to the Moffett Board's evaluation and opinion

regarding the wage increases for Local 2's 709 professional employees. While the terms

contested in Kasher and Moffett Awards are similar, WMATA is challenging a different written

arbitral opinion, which had not even been issued at the time, cites different evidence, and awards

a different contract to a different union. Moreover, while the Maryland court upheld the Kasher

Board's determination that the Local 689 increases were affordable, it did not consider whether

WMATA could afford the *additional* dollar amounts addressed in the Moffett Award—estimated

at $18.7 million, *see* Resp't's Reply Mem. Supp. Conf. Arb. Award 13–14, ECF No. 17—on top

of the already large Kasher Award. WMATA is not collaterally estopped from challenging the

Moffett Board's general wage adjustments.


## IV. REVIEW OF THE MOFFETT AWARD

Having determined that WMATA is not collaterally estopped from bringing this action,

the Court proceeds to review the Moffett Award. The petition alleges that there are three main

grounds on which the Court must vacate the Moffett Award, all of which arise under the

Standards Act.  First, WMATA alleges that the Moffett Award provisions granting pay increases did not comply with section 18303 of the Standards Act, which requires that certain enumerated factors be considered and factual findings be made.  *See* 40 U.S.C. § 18303 (2006); *see also id.* § 18304(c)(7) (requiring a court to vacate an arbitration award if the arbitrator did not comply with section 18303).  Second, WMATA challenges the general wage adjustments and subcontracting provisions on the ground that the Moffett Board's decision was arbitrary or capricious.  *See id.* § 18304(c)(3).  Finally, WMATA challenges the new subcontracting provisions and pay bands as exceeding the arbitrator's powers.  *See id.* § 18304(c)(2).[7]  The Court will address each legal challenge in turn.

## A.  Applicability of the Standards Act

The proper standard of review is a critical point of contention between the parties.  As a general matter, the standard by which federal courts review arbitral awards is "among the narrowest known to the law."  *Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 91 (1978) (per curiam); *accord Local 689 I*, 818 F. Supp. 2d at 895; *see also Kurke v. Oscar Gruss & Son, Inc.*, 454 F.3d 350, 354 (D.C. Cir. 2006) ("As we have repeatedly recognized, judicial review of arbitral awards is extremely limited . . . ." (quoting *Teamsters Local Union No. 61 v. United Parcel Serv., Inc.*, 272 F.3d 600, 604 (D.C. Cir. 2001)) (internal quotation marks omitted)).  It is clear from the parties' briefing that the central issue in this case is whether—and to what

---

[7] To be specific, the petition alleges that *each* of the legal bases for vacating the arbitration award applies to *all three* challenged provisions of the Moffett Award.  *See* Pet. Vacate Arb. Award ¶¶ 41, 43–45, ECF No. 1.  However, WMATA's motion for summary judgment is limited to the legal challenges described above.  Because the parties have jointly represented that "resolution of these motions should settle all issues remaining in this case[,]" Joint Status Rep. 2, ECF No. 18, the Court understands that WMATA no longer challenges the general wage adjustments as exceeding the arbitrator's powers, the new subcontracting provisions as failing to comply with 40 U.S.C. § 18303, or the pay bands as arbitrary or capricious or failing to comply with 40 U.S.C. § 18303.

extent—the Standards Act dictates that a more rigorous standard of review be applied to judicial review of interest arbitration awards in which WMATA is the employer.

1. Common Law Review of Arbitral Awards

Before Congress enacted the Standards Act, the D.C. Circuit held that the common law standard governed judicial review of arbitrations between WMATA and Local 2. *See Office & Prof'l Emps. Int'l Union, Local 2 v. WMATA*, 724 F.2d 133, 139 (D.C. Cir. 1983). The Court therefore opens, by way of background, with a discussion of that standard.

Ordinarily, "[a] principal characteristic of the common law of labor arbitration in the United States is judicial deference to arbitral decisions." *Devine v. White*, 697 F.2d 421, 435 (D.C. Cir. 1983), *abrogated on other grounds by Cornelius v. Nutt*, 472 U.S. 648 (1985). As the Supreme Court has held:

> [I]f an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision. It is only when the arbitrator strays from interpretation and application of the agreement and effectively dispense[s] his own brand of industrial justice that his decision may be unenforceable. When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's improvident, even silly, factfinding does not provide a basis for a reviewing court to refuse to enforce the award.

*Major Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (per curiam) (second alteration in original) (citations omitted) (internal quotation marks omitted). The level of deference is even greater when a federal court reviews arbitral decisions of a procedural nature. *See Teamsters Local Union No. 61 v. United Parcel Serv., Inc.*, 272 F.3d 600, 604 (D.C. Cir. 2001) (citing *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (1964)).

"This extraordinarily deferential standard is essential to preserve the efficiency and finality of the labor arbitration process." *Nat'l Postal Mail Handlers Union v. Am. Postal Workers Union*, 589 F.3d 437, 441 (D.C. Cir. 2009); *see also United Steelworkers of Am. v.*

*Enter. Wheel & Car Corp.*, 363 U.S. 593, 596 (1960) ("The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards."). With these principles in mind, courts "review an arbitral decision with the presumption that the common law standard of deference applies." *Local 2*, 724 F.2d at 137. The D.C. Circuit has further noted that "[t]hese critical principles . . . can elude parties who sometimes quixotically seek to overturn labor arbitration decisions . . . ." *Nat'l Postal Mail Handlers Union*, 589 F.3d at 441. Up until at least the time the Standards Act went into effect, these principles applied to arbitration under the Compact as well. The D.C. Circuit once noted that, "[a]s in traditional arbitration, Compact arbitration is designed to preserve industrial peace." *Local 2*, 724 F.2d at 138. And in enacting the Compact, "Congress chose words which create the expectation of finality, of decisions not subject to judicial second-guessing." *Id.*

### 2. The Standards Act

When the D.C. Circuit originally held that the highly deferential common law standard of judicial review applied to arbitrations under the Compact, it noted in dicta that, "[o]bviously, Congress could have displaced the presumption that the standard of review be based on deference . . . in either the Compact itself or in another enactment." *Id.* In 1995, Congress followed suit by enacting the Standards Act. The Act was part of a larger transportation appropriations law, *see generally* Act of Nov. 15, 1995, Pub. L. No. 104-50, 109 Stat. 436 (codified as amended at scattered sections of U.S.C.), and was enacted with the express purpose of "lower[ing] operating costs for public transportation in the Washington metropolitan area." 40 U.S.C. § 18301(b) (2006). WMATA asserts that the Act "displaced the former deferential standard of review and replaced it with a specific set of requirements governing the scope of judicial review of arbitration decisions resolving the terms and conditions of employment

involving [WMATA]." Pet'r's Resp. Mot. Summ. J. 4, ECF No. 16 (internal quotation marks omitted). Local 2 argues that the deferential, common law standard survives Congress's enactment of the Standards Act in this context.[8] *See* Resp't's Mem. Supp. Mot. Dismiss Pet. & Conf. Arb. Award 10–11, ECF No. 13-1. WMATA's argument hits closer to the mark, and the Court joins the District of Maryland in finding "that Congress, through the Act, did abrogate the common law of arbitration as it applies to the Compact . . . ." *Local 689 I*, 818 F. Supp. 2d at 903.

The Court notes at the outset that the Standards Act applies only to interest arbitrations involving "an interstate compact agency operating in the national capital area . . . ." 40 U.S.C. § 18302(1) (2006). Two separate inquiries are bound up in this provision: first, whether the Act applies to the parties; and second, whether this arbitration is the type of proceeding at which the Standards Act is aimed. The Court finds—and the parties do not dispute—that both questions are resolved in the affirmative. As discussed above, WMATA "provides public transit services and . . . was established by an interstate compact to which the District of Columbia is a signatory." *Id.* § 18302(3). In fact, WMATA appears to be the only entity within the Act's purview. *See also Local 689 I*, 818 F. Supp. 2d at 899–900 n.8. The scope of the Standards Act

---

[8] Local 2 also argues that the Standards Act violates the Tenth Amendment by amending an interstate compact without the consent or ratification of the signatory states. *See* Resp't's Mem. Supp. Mot. Dismiss Pet. & Conf. Arb. Award 12–20, ECF No. 13-1. But "prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981) (citing *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)). Because the Court finds that the Moffett Award meets even the heightened standard imposed by the Standards Act, the Court need not reach the Union's constitutional challenge. The Court's decision to vacate the Board's peopling of the new pay bands similarly does not trigger Local 2's constitutional challenge because, as described more fully below, the Standards Act does not impose a *sui generis* standard of review with respect to an arbitrator's authority; the common law governing judicial review of arbitral awards controls that component of the Court's analysis. *See infra* Part IV.B.3.a.

is further limited to exclude rights arbitrations—that is, arbitral proceedings relating to "the interpretation and application of rights arising from an *existing* collective bargaining agreement." 40 U.S.C. § 18302(1)(B) (emphasis added). Because the instant case arises out of an interest arbitration—that is, a proceeding in which the arbitrator sets forth provisions to be included in a *renewed* collective bargaining agreement, *see W. Coast Sheet Metal, Inc. v. NLRB*, 938 F.2d 1356, 1357 (D.C. Cir. 1991)—the exception does not apply.

Because the Standards Act applies on its face to this arbitration, the Court must next determine whether the Act's procedures are mandatory or permissive in their application. Section 18303 of the Standards Act uses imperative language in setting forth specific factors and guidelines for the arbitration board to follow in rendering an award. Subsection (b) provides that "[a]n arbitrator rendering an arbitration award involving the employees of [WMATA] *may not* make a finding or a decision for inclusion in a collective bargaining agreement governing conditions of employment without considering" seven enumerated factors (the "Factors"). 40 U.S.C. § 18303(b) (2006) (emphasis added). Subsection (c) provides that the arbitrator "*may not* . . . provide for salaries and other benefits that exceed the ability of [WMATA], or of any governmental jurisdiction that provides subsidy payments or budgetary assistance to [WMATA], to obtain the necessary financial resources to pay for wage and benefit increases . . . ." *Id.* § 18303(c) (emphasis added). And subsection (d) contains a number of mandates, requiring that (1) "the arbitrator *shall* issue a written award that demonstrates that all the factors set forth in subsections (b) and (c) have been considered and applied"; (2) the arbitrator "may grant an increase in pay rates or benefits . . . *only if* the arbitrator concludes that any costs to the agency do not adversely affect the public welfare"; and (3) "[t]he arbitrator's conclusion regarding the public welfare *must* be supported by substantial evidence." *Id.* § 18303(d) (emphases added).

The Act's judicial review provision contains similarly binding language. Section 18304 mandates that:

> The court *shall* review the award on the record, and *shall* vacate the award or any part of the award, after notice and a hearing, if—
>
> > (1) the award is in violation of applicable law;
> >
> > (2) the arbitrator exceeded the arbitrator's powers;
> >
> > (3) the decision by the arbitrator is arbitrary or capricious;
> >
> > (4) the arbitrator conducted the hearing contrary to the provisions of this chapter or other laws or rules that apply to the arbitration so as to substantially prejudice the rights of a party;
> >
> > (5) there was partiality or misconduct by the arbitrator prejudicing the rights of a party;
> >
> > (6) the award was procured by corruption, fraud, or bias on the part of the arbitrator; or
> >
> > (7) the arbitrator did not comply with the provisions of section 18303 . . . .

*Id.* § 18304(c) (emphases added). The plain meaning of the statutory text thus demonstrates a clear legislative intent that the Standards Act's procedures are mandatory, not permissive. *See Zivotofsky v. Sec'y of State*, 571 F.3d 1227, 1243 (D.C. Cir. 2009) (Edwards, J., concurring) ("'Shall' has long been understood as 'the language of command.'" (quoting *Escoe v. Zerbst*, 295 U.S. 490, 493 (1935))), *vacated on other grounds sub nom. Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S.Ct. 1421 (2012).

The Court rejects Local 2's assertion that the Standards Act is inapplicable because the Compact provides for "final and binding" interest arbitration. *See, e.g.*, Answer & Countercl. ¶ 1, ECF No. 5 (citing Compact § 66). In considering whether this Compact language limits the scope of judicial review even before the Standards Act came into effect, the D.C. Circuit held that "[t]he 'final and binding' clause had nothing to do with judicial review." *Local 2*, 724 F.2d at 138. According to the legislative history, "the clause was envisioned as a 'no strike, no lock-

out' provision." *Id.* (citing H.R. Rep. No. 92-115, at 9 (1972)). Moreover, even if the "final and binding" clause previously foreclosed heightened judicial scrutiny of arbitral awards, the D.C. Circuit noted that Congress could displace the standard of review "in another enactment." *Id.*

The Standards Act therefore governs this dispute, and application of the Act's factors is mandatory. This holding is consistent with the findings and purpose of the Standards Act, which provide that "[t]he purpose of [the Act] is to adopt standards governing arbitration that *must* be applied . . . in order to lower operating costs for public transportation in the Washington metropolitan area." 40 U.S.C. § 18301(b) (emphasis added).

### B. Application of the Standards Act

Having determined that the Standards Act sets forth mandatory criteria by which a court must review interest arbitration awards involving WMATA employees, the Court proceeds to review the Moffett Award pursuant to the Act. WMATA asserts that there are three independent bases on which the Court must vacate the Award: (1) that the Board failed to comply with section 18303 of the Standards Act; (2) that the Award was arbitrary or capricious; and (3) that the Board exceeded its authority. Local 2 argues that the Award complies with each of these requirements.

Application of the Standards Act presents several issues of first impression in this district. Indeed, the District of Maryland litigation involving the Kasher Award is the only case in *any* jurisdiction in which the Standards Act has been applied—a case that, the Court further notes, did not result in an appeal to the Fourth Circuit. Judge Messitte's opinion in the Maryland case synthesized the Standards Act's arbitrary or capricious review with the section 18303 requirements to set forth the following "hybrid" standard:

> [C]ompliance with the Standards Act requires that the panel issue a detailed written explanation of its decision that, at a minimum: (1) discusses each of the

statutory factors in some detail; (2) applies each of the factors to the dispute at issue; (3) points to specific evidence in the record—by making reference to exhibits—relevant to each and every statutory factor; (4) weighs the applicable evidence pro and con; (5) states the panel's ultimate conclusions; and (6) provides a clear explanation of the reasoning behind the panel's ultimate conclusions.

*Local 689 I*, 818 F. Supp. 2d at 904. Further, under Judge Messitte's test, "the presumption of validity applied to the Board's conclusions is more deferential than that which would apply in the administrative law setting." *Local 689 II*, 804 F. Supp. 2d at 476 n.40. This synthesis "incorporates elements of both the exceptionally narrow standard that ordinarily applies when a court reviews the decision of an arbitration panel and the somewhat broader—but still highly deferential—standard that ordinarily applies to a court's review of the decision of an administrative agency." *Id.* at 476. The Maryland court arrived at this "hybrid" standard after reviewing case law setting forth the arbitrary or capricious and substantial evidence review standards in the context of the Administrative Procedure Act ("APA") along with the mandatory factors set forth in section 18303 of the Standards Act. *See Local 689 I*, 818 F. Supp. 2d at 903–04.

WMATA urges the Court to adopt the Maryland court's "hybrid" standard. The Court, however, departs slightly in its review. Rather than apply a "hybrid" standard that blends arbitrary or capricious review, substantial evidence review, and scrutiny of the section 18303 factors in a single discussion, the Court finds that the Act's enumeration of these requirements as discrete grounds for judicial review dictates that the Award's adherence to section 18303's technical and procedural requirements be analyzed apart from the Court's arbitrary or capricious review. *See* 40 U.S.C. § 18304(c)(1)–(7) (2006). In other words, the Standards Act's judicial review provision sets forth separate inquiries: first, whether the Board formally considered and applied the factors set forth in section 18303; and second, whether the Board's application of those factors was arbitrary or capricious. *See id.* § 18304(c)(3), (7). The parties seem to agree

that WMATA's third challenge—that the Board exceeded its power, *see id.* § 18304(c)(2)—

warrants a separate analysis as well.

### 1. Compliance with Section 18303

The Moffett Board awarded the following general wage adjustments: a 2 percent lump

sum payment effective July 1, 2008, and a 3 percent general wage increase effective July 1 in the

years 2009, 2010, and 2011. *See* Award at 6. WMATA challenges these adjustments both on

their own accord and to the extent that they incidentally raise prospective pension benefits for

employees by increasing deferred compensation. *See* Pet'r's Mem. P. & A. Supp. Mot. Summ. J.

1, ECF No. 14-1. The asserted grounds for vacating the wage adjustments are twofold: first,

that the Board failed to comply with section 18303 of the Standards Act in awarding the

adjustments; and second, that the decision to award general wage adjustments was arbitrary or

capricious. The Court will first address WMATA's section 18303 challenge.

### a. Standard of Review

Under the Standards Act, the Court must vacate any part of the award for which "the

arbitrator did not comply with the provisions of section 18303 . . . ." 40 U.S.C. § 18304(c)(7)

(2006). WMATA argues that the Moffett Board failed to comply with five separate provisions

of section 18303, presenting each provision in its briefing as a discrete standard under which an

award may be vacated. *See* Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 15–36, ECF No. 14-1.

Local 2 does not devote a substantial amount of discussion to the section 18303 standard of

review. As discussed below, the Court disagrees with WMATA's characterization of section

18303 and finds that the provision sets forth two requirements that are largely procedural in

nature.

Section 18303(d)(1) specifies the requirements of the written arbitral award:

In resolving a dispute submitted to arbitration involving the employees of [WMATA], the arbitrator shall issue a written award that demonstrates that all the factors set forth in subsections (b) and (c) have been considered and applied.

40 U.S.C. § 18303(d)(1) (2006). Notably, the provision does not set forth a substantive standard,

*cf. id.* § 18303(d)(3) (singling out the public interest factor for substantial evidence review), but

merely requires a written award that "demonstrates" that the mandatory factors have been

"considered and applied." *Id.* § 18303(d)(1).

Sections 18303(b) and (c), which subsection (d)(1) references, similarly lack a

substantive standard. Section 18303(b) provides that an arbitrator

may not make a finding or a decision for inclusion in a collective bargaining agreement governing conditions of employment without considering the following factors:

(1) The existing terms and conditions of employment of the employees in the bargaining unit.

(2) All available financial resources of the interstate compact agency.

(3) The annual increase or decrease in consumer prices for goods and services . . . .

(4) The wages, benefits, and terms and conditions of the employment of other employees who perform, in other jurisdictions in the Washington standard metropolitan statistical area, services similar to those in the bargaining unit.

(5) The special nature of the work performed by the employees in the bargaining unit . . . .

(6) The interests and welfare of the employees in the bargaining unit, including—

(A) the overall compensation presently received by the employees . . . ;

(B) all benefits received by the employees . . . ; and

(C) the continuity and stability of employment.

(7) The public welfare.

*Id.* § 18303(b).  And section 18303(c) sets forth an additional requirement with respect to increased salaries or benefits:

> An arbitrator rendering an arbitration award involving the employees of [WMATA] may not, with respect to a collective bargaining agreement governing conditions of employment, provide for salaries and other benefits that exceed the ability of [WMATA], or of any governmental jurisdiction that provides subsidy payments or budgetary assistance to [WMATA], to obtain the necessary financial resources to pay for wage and benefit increases . . . .

*Id.* § 18303(c).  These provisions, incorporated by and read together with subsection (d)(1), set forth the first procedural requirement of section 18303:  that a board must consider the seven factors enumerated in subsection (b), reach the conclusion that any awarded salary or benefit increases do not exceed the ability of WMATA and the Compact Jurisdictions to obtain the necessary funding, and issue a written opinion showing that these factors and conclusions have been considered and applied.  Section 18303 does not lay out a *substantive* measure by which the factors are evaluated or evidence is weighed—that standard is found in section 18304(c)(3), which *separately* requires the Court to vacate an award that is arbitrary or capricious.  *Compare id.* § 18304(c)(7) (requiring a court to vacate an award that fails to comply with section 18303), *with id.* § 18304(c)(3) (requiring a court to vacate an award that is arbitrary or capricious).  The Court will therefore incorporate the substantive application of the section 18303 factors into its arbitrary or capricious review.  *See infra* Part IV.B.2.  At this stage of the review, the Court will look to the Board's written opinion to determine whether it discusses the mandatory factors in some detail and applies each to the parties' dispute.  *See also Local 689 I*, 818 F. Supp. 2d at 904 (setting forth, as factors (1) and (2) of the "hybrid" test, requirements that the award "discuss[] each of the statutory factors in some detail" and "appl[y] each of the factors to the dispute at issue").

The remainder of section 18303 relates to the arbitrator's consideration of the "public welfare." Section 18303(d)(2) provides that "[a]n award may grant an increase in pay rates or benefits . . . only if the arbitrator concludes that any costs to the agency do not adversely affect the public welfare." 40 U.S.C. § 18303(d)(2). The provision merely requires that the arbitrator "conclude" that the public welfare is not harmed; it sets no substantive guidance regarding the weight or application of evidence. The substantive guidance on public welfare is found in subsection (d)(3)—the only part of section 18303 to set forth such guidance. It requires that "[t]he arbitrator's conclusion regarding the public welfare must be supported by substantial evidence." *Id.* § 18303(d)(3).

To summarize, the Court interprets section 18303 as containing two requirements: first, that a board issue a written arbitral award demonstrating that it has considered the factors and conclusions set forth in subsections (b) and (c); and second, that it reach a conclusion, supported by substantial evidence, that the public welfare is not adversely affected by any salary or benefits increases issued in its award. Because section 18303 specifies an evidentiary standard for only Factor 7, the public welfare, the Court will not substantively scrutinize the remaining factors at this stage. It will instead incorporate the 18303 factors into its arbitrary or capricious review.

The Court's interpretation is supported by WMATA's own briefing. Despite casting its challenges as arising under five different provisions of section 18303, its arguments repetitively challenge the Board's substantive application of evidence to the section 18303 factors and conclusions—a component of arbitrary or capricious review—and for the most part do not contend that the Board failed to *address* each of the mandatory factors or reach the necessary conclusions. Indeed, WMATA's arbitrary or capricious challenge merely echoes the same arguments it offers under section 18303. Therefore, to give relevance to the Standards Act's

separate enumeration of these bases for vacating an award, the Court finds it most appropriate to view section 18303 as setting forth procedural requirements in the form of formal application of mandatory factors and conclusions, while substantive review of the award—including scrutiny of the Board's application of the mandatory factors—falls within the Court's arbitrary or capricious review.

### b. Analysis

Having reviewed the statute and having separated its requirements into two categories—section 18303's procedural requirements on the one hand, and substantive scrutiny of its factors under arbitrary or capricious review on the other—the Court will now apply section 18303.

### i. Sections 18303(b), (c), and (d)(1)

As explained above, the first procedural requirement of section 18303 mandates that the Board issue a written award demonstrating that (1) the seven statutory factors enumerated in subsection (b) were considered and applied; and (2) the Board concluded that any awarded salary or benefit increases do not exceed the ability of WMATA and the Compact Jurisdictions to obtain the necessary funding. *See id.* § 18303(b)–(d)(1). The Court will consider this requirement satisfied as long as the Award discusses each factor in some detail and applies each to the dispute between Local 2 and WMATA.

WMATA argues that the Award fails to show that the Board considered and applied *any* of the seven statutory factors. But to the contrary, the Moffett Award's general wage adjustment discussion spans 15 pages, 13 of which specifically outline the seven factors listed in section 18303(b). *See* Award at 6–21. The Board discussed each factor in detail under its own heading[9]

_____

[9] The Board chose to address Factors 2 and 7 (respectively, WMATA's financial resources and the public welfare) within a single section because together they involved all

23

and described the impact each factor had on the Board's adjudication of the dispute. The Award

states that Factors 2, 3, and 7 support modest wage increases, *see id.* at 12–15, while Factor 6

supports the status quo, *see id.* at 19. The Board determined that Factor 4 "does not weigh

heavily" in either party's favor due to the insufficiency of the evidence presented. *See id.* at 18.

WMATA's complaints about these factors relate to the Board's reasoning and will therefore be

addressed under the Court's section 18304(c)(3) arbitrary or capricious analysis.

WMATA does appear to take exception—on a procedural basis—to Factors 1 and 5 of

the Board's analysis. As to Factor 1—the terms of the existing CBA—WMATA argues that

"there is no indication from the face of the Award as to the precise impact this mandatory factor

had on the Board's decision." Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 17, ECF No. 14-1.

But the Board's discussion of that factor makes clear it considered the existing CBA to create a

presumption in favor of the status quo, placing the burden on the party advocating modification

of any terms to show good cause:

> As Factor 1 suggests, the starting point for any interest [a]rbitration is the current
> collective bargaining agreement and the terms and conditions established therein.
> Those seeking structural change, or any change incompatible with the parties'
> bargaining history, need to prove that special circumstances or intervening events
> warrant the change.

Award at 7. Indeed, it found this burden met for several components of the Award. *See id.*

WMATA cannot close its eyes to the clear text of the Board's application of Factor 1 and then

argue that the Board failed to state how it applied the factor.

The Board's application of Factor 5—the "special nature" of Local 2 employees' work—

is not quite as explicit but is nonetheless readily apparent from the text of the Award. The

Board's decision states that the Chairman found the Local 2 employees' duties "peculiar to

---

evidence and argument relating to WMATA and the Compact Jurisdictions' ability to pay. *See*
Award at 7–13.

WMATA in the local area" and similar only to that of other WMATA employees. *Id.* at 18–19. The decision then makes explicit reference to two other areas of the Award—Factor 4 and WMATA's internal patterns—which, respectively, address the terms and conditions governing employment of employees who perform similar services at other companies and agencies in the D.C. metropolitan area and within WMATA itself. *See id.* A review of those sections makes plain that, because the Board found the nature of Local 2 employees' duties to be comparable only to those of other WMATA employees, the factor weighed in favor of tracking the Kasher Award. *See id.* at 20–21.

WMATA also challenges the Moffett Award's compliance with section 18303(c), arguing that "the Board issued an award increasing salaries and benefits without demonstrating that WMATA and the Compact Jurisdictions have the ability to obtain the funding necessary to pay for those increases." Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 30, ECF No. 14-1. But WMATA's argument is a substantive one—that the Board's decision to award general wage increases went against the record evidence. *See id.* at 30–36. That analysis falls not under section 18304(c)(7), but under 18304(c)(3), and the Court will address it in due course. At this stage, the Court is satisfied that the Board's written decision includes a conclusion that WMATA and the Compact Jurisdictions have the ability to pay the wage and benefit increases. *See* Award at 12–13; *see also infra* Part IV.B.1.b.ii (discussing the Board's "public welfare" conclusion).

*ii.  Sections 18303(d)(2) and (d)(3)*

Section 18303(b)(7) requires the Board to consider "[t]he public welfare" in rendering an award. 40 U.S.C. § 18303(b)(7). The Standards Act defines the term "public welfare" to include:

> (1) the financial ability of the individual jurisdictions participating in the compact to pay for the costs of providing public transit services; and

> (2) the average per capita tax burden, during the term of the collective bargaining agreement to which the arbitration relates, of the residents of the Washington metropolitan area, and the effect of an arbitration award rendered under that arbitration on the respective income or property tax rates of the jurisdictions that provide subsidy payments to the interstate compact agency established under the compact.

*Id.* § 18303(a). Because the Award includes an increase in pay rates, the Act requires that "the arbitrator conclude[] that any costs to the agency do not adversely affect the public welfare." *Id.* § 18303(d)(2). This conclusion "must be supported by substantial evidence." *Id.* § 18303(d)(3).

"Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (citing *Ballston–Stillwater Knitting Co. v. NLRB*, 98 F.2d 758, 760 (2d Cir. 1938), *Appalachian Elec. Power Co. v. NLRB*, 93 F.2d 985, 989 (4th Cir. 1938), and *NLRB v. Thompson Prods.*, 97 F.2d 13, 15 (6th Cir. 1938)); *see also FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002) ("The 'substantial evidence' standard requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." (citing *Whitmore v. AFIA Worldwide Ins.*, 837 F.2d 513, 515 n.4 (D.C. Cir. 1988))). "When reviewing for substantial evidence, [the Court does] not ask whether the record could support the petitioner's view of the issue, but whether it supports the [arbitrator]'s ultimate decision. The substantial evidence inquiry turns not on how many discrete pieces of evidence the [arbitrator] relies on, but on whether that evidence adequately supports its ultimate decision." *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010) (citation omitted).

The procedural component of the public welfare analysis requires the Board to reach the conclusion that the awarded wage and benefit increases do not adversely affect the public welfare. *See* 40 U.S.C. § 18303(d)(2). WMATA argues that "[t]his required statutory finding cannot be found anywhere in the award," and that the Board's statement that "the statutory

definition of 'public welfare' must be honored" is "devoid of application or analysis . . . ."
Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 21, ECF No. 14-1 (emphasis omitted). Again,
WMATA appears to overlook aspects of the Board's written decision. The Award does not use
the exact language of the statute to conclude that "any costs to the agency do not adversely affect
the public welfare[,]" 40 U.S.C. § 18303(d)(2), but the Court will not require such exact wording
as long as it is clear that the Board found no harm to public welfare. The Board found that
"[i]ncluded in [WMATA's] budgets are the sums necessary to fund" Local 2's wage increases,
and that "the cost of the [A]ward will [not] cause an increase in subsidies, tax rates, or tax
burdens." Award at 12–13. The Board also "reject[ed] the argument that no increases in labor
costs are affordable, or that the awarded increases will have an adverse effect on tax burdens or
rates." *Id.* at 13. In the context of the statutory definition of public welfare, *see* 40 U.S.C.
§ 18303(a), the Court finds these statements equivalent to a conclusion that the public welfare is
not adversely affected. The Court finds further support for its conclusion in the *Local 689* case,
in which Judge Messitte found subsections (c) and (d)(2) satisfied based on nearly identical
language contained within the Kasher Award. *See Local 689 II*, 804 F. Supp. 2d at 477 n.41.

The Court also finds that the Board's public welfare conclusion is based on substantial
evidence. *See* 40 U.S.C. § 18303(d)(3). The Board addressed the public welfare factor in
conjunction with its discussion of WMATA's financial resources, *see id.* § 18303(b)(2), (7),
finding that both factors relate to WMATA's ability to pay the wage increases. *See* Award at 7.
As the Board noted, "[t]he parties devoted a great deal of evidence to this factor . . . ." *Id.* at 8.
WMATA presented evidence of the budgetary problems brought about by the recession, which
impacted both the Authority and the Compact Jurisdictions. The Award summarizes this
evidence, noting that WMATA had projected budget shortfalls over the next contract term while

the Compact Jurisdictions expected no increase in revenues over expenditures until at least 2012. *See id.* at 9. To close its budget gap, WMATA increased fares, reallocated funds from its capital budget to its operating budget, and obtained subsidies from the Compact Jurisdictions. *See id.* at 9–10. Local 2 put forward documentary evidence showing that the Authority had already budgeted a 3 percent wage increase for unionized employees and that its budget assumed that retirement, health, and welfare programs would be funded at present levels. *See id.* at 11; J.A. 3673 ("The average annual pay increased for FY2011 by $4,904 or 7.3 percent. This is due to a 1.1 percent increase in staffing levels and a 3.0 percent budgeted increase for unionized staff.").

After summarizing both sides' evidence—a summary that spans four pages of the written opinion—the Board agreed with WMATA that the Authority could not afford the Union's proposed 4 percent across-the-board increase for each contract year. *See* Award at 12. After crediting the Union's evidence regarding WMATA's budget, however, the Board did find that the awarded increase was affordable, in part because WMATA had already budgeted for it. *See id.* In finding that the increases were affordable and already accounted for, the Board also found "no evidence that the cost of the award will cause an increase in subsidies, tax rates, or tax burdens." *Id.* at 13. As further evidence of its finding that tax burdens would not be affected, the Board noted that "the annual cost of the award is negligible as a percent of the operating budgets of the jurisdictions paying the subsidy." *Id.* Thus, in finding that the public welfare was not adversely affected by an increase within the amount WMATA had budgeted, the Board relied upon more than a mere "scintilla" of evidence. *See FPL Energy Me. Hydro LLC*, 287 F.3d at 1160. Indeed, the Board credited WMATA's evidence as it applied to the Union's proposed wage increases. And although the Authority disputes the Board's finding that the increases were budgeted in FY2011 by pointing to oral testimony regarding FY2010's budget, which may have

budgeted only a 1 percent lump sum payment for Local 2, FY2010 was closed and moot by that point because the FY2011 budget, presuming "a 3.0 percent budgeted increase for unionized staff[,]" J.A. 3673, was already compiled and entered in the arbitral record. *See* Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 18 n.10, ECF No. 14-1 ("The only direct evidence as to what wage adjustments, if any, were budgeted for the Local 2 bargaining unit for FY2009–FY2012 is Ms. Kissal's acknowledgement that the FY2010 budget included the 1% lump sum wage payment proposed by WMATA."); J.A. 505 (Arb. Tr. 1215:1–4, July 16, 2010) (acknowledging that FY2010 is "a moot point because 2010 is closed"). Although the documentary evidence in support of the FY2011 budget is not proof positive that 3.0 percent increases were budgeted for *all* unionized staff, WMATA has not pointed to contradictory evidence for FY2011 or later, and the Court will not reweigh the Board's evaluation of the documentary evidence against oral testimony concerning a prior year's budget. *See Ind. Mun. Power Agency v. FERC*, 56 F.3d 247, 254 (D.C. Cir. 1995) ("Once assured the [agency] has engaged in reasoned decisionmaking, it is not for us to reweigh the conflicting evidence or otherwise to substitute our judgment for that of the [agency]."); *Pub. Citizen Health Res. Grp. v. Tyson*, 796 F.2d 1479, 1495 (D.C. Cir. 1986) ("Our function . . . is only to search for *substantial* evidence, not proof positive. Furthermore, we do not reweigh the evidence and come to our own conclusion; rather, we assess the reasonableness of [the agency]'s conclusion.").

WMATA argues that the Board "erroneously excluded fare increases, as well as other financial measures necessary to fund the awarded increases, from its analysis of the impact its award would have on the public welfare." Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 21, ECF No. 14-1. Although WMATA is correct that the use of the word "includes" in the statutory definition of public welfare allows the Board to look beyond the tax and ability-to-pay

considerations, the Board did acknowledge the fare increase that the Authority had already initiated. *See* Award at 11. However, the Board, as discussed above, found that the awarded increases were already within WMATA's budget, and WMATA has not demonstrated that the Board failed to consider evidence showing that fares or subsidies would increase further as a result of the Award.

Citing the same evidence discussed in the Board's written opinion, WMATA also argues substantively that WMATA and the Compact Jurisdictions lack the ability to fund the increases, and so the wage adjustments will harm the public welfare. *See* Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 21–36, ECF No. 14-1 (discussing sections 18303(c), (d)(2), and (d)(3) of the Standards Act). The Authority essentially invites the Court to reweigh the evidence that was before the Board, but that is not the Court's role. *See Ind. Mun. Power Agency*, 56 F.3d at 254; *Tyson*, 796 F.2d at 1495. There was undoubtedly evidence on both sides of the issue as illustrated not just by the arbitral record but also by the Award itself, which included an awarded increase in between the parties' two proposals. The Board's conclusion that the increases were affordable—and therefore not adverse to the public welfare—was reasonable based on the evidence cited. The Court is particularly mindful of the deferential view it must take in light of the Maryland court's observation—with which this Court agrees—that

> [a]ll projected funding sources cited by the Board must to a considerable extent be speculative, since it can never be posited with certainty in advance precisely how much each of the Compact [J]urisdictions will contribute to WMATA's budget. Those contributions will always be a function of what level of services the jurisdictions (and their constituents) demand, and what they are prepared to pay for.

*Local 689 II*, 804 F. Supp. 2d at 478. The Court will therefore not lightly intrude upon the Board's weighing of the various funding sources at issue.

The Court also notes that WMATA's proposed analysis of the public welfare is so expansive that it would virtually foreclose the possibility of wage increases under nearly any circumstance. WMATA points to the diversion of funds from other potential expenditures, *see* Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 26–29, ECF No. 14-1, yet *any* wage increase will divert funds that could have been spent for some other purpose. Indeed, given WMATA's repeated implication that the recession prevented any increase in wages at all, it is unclear how the Authority's *own* proposed 1 percent lump-sum payment for each contract year, *see* J.A. 1193, would have survived scrutiny under such a strict analysis of public welfare. As the Maryland court noted, "[i]f there is an exhibit in the record that might somehow establish the precise point at which a proposed compensation increase tips from being affordable to having an adverse effect on the public welfare[,] neither party has brought it to the Court's attention." *Local 689 II*, 804 F. Supp. 2d at 478. Absent such evidence, the Court finds the Board's public welfare conclusion reasonable.

### 2. Arbitrary or Capricious Review

WMATA also challenges the Moffett Award to the extent that particular provisions are arbitrary or capricious. Specifically, WMATA argues that the general wage adjustments and new subcontracting provisions are invalid under this standard and must be vacated. The Court's authority to review the Award for arbitrariness and capriciousness arises under section 18304(c)(3) of the Standards Act. *See* 40 U.S.C. § 18304(c)(3) (2006).

#### a. Standard of Review

As noted above, Congress sought to displace the deferential common law standard of review of arbitral decisions when it enacted the Standards Act. Under this revised standard, the Court must vacate an arbitral award if "the decision by the arbitrator is arbitrary or

capricious . . . ." *Id.* During the litigation over the Kasher Award, Judge Messitte of the District of Maryland applied the Standards Act's arbitrary or capricious review as a matter of first impression. The parties do not devote substantial discussion in their briefing to the meaning of "arbitrary or capricious" and how it relates to similar language used elsewhere in the United States Code, instead relying primarily on Judge Messitte's "hybrid" standard—which is not binding on this court—for their argument.

Judge Messitte's opinion adopts in large part the standard of judicial review applicable to agency actions under the APA—the context in which the "arbitrary or capricious" review is most often applied—but slightly tweaks the standard by finding that under the Standards Act "the presumption of validity applied to the Board's conclusions is more deferential than that which would apply in the administrative law setting." *Local 689 II*, 804 F. Supp. 2d at 476 n.40. The Court departs from this latter aspect of the Maryland court's decision. The meaning of "arbitrary or capricious" is well-settled through the application of administrative law—particularly in this district—and the Supreme Court "ha[s] often observed that when 'judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its . . . judicial interpretations as well.'" *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 130 S.Ct. 1605, 1616 (2010) (second alteration in original) (quoting *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998)). In the absence of statutory text in the Standards Act that incorporates features of the deferential common law standard, the Court understands Congress to have intended the words "arbitrary or capricious" to signify what those words were well-known to have meant in 1995 when the Act was signed into law. Therefore, the Court finds that the Standards Act supplies a *sui generis* standard of review that does not enmesh with, but rather supplants, the deferential common law

standard.  Because the Act uses the same language as the judicial review provision of the APA in this respect, *see* 5 U.S.C. § 706(2)(A) (2012) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . *arbitrary, capricious*, an abuse of discretion, or otherwise not in accordance with the law . . . ." (emphasis added)), the Court will apply the already highly deferential "arbitrary or capricious" standard that governs judicial review of most agency actions.

"Under the 'arbitrary and capricious' standard the scope of review is a narrow one." *Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974).  On review, the Court gives the arbitrator's decision "significant leeway" and does not substitute its own judgment for that of the arbitrator.  *Steel Mfrs. Ass'n v. EPA*, 27 F.3d 642, 646 (D.C. Cir. 1994). Instead, the Court will review the arbitrator's award in order to determine the Board has "articulate[d] a 'rational connection between the facts found and choices made.'"  *Bowman Transp.*, 419 U.S. at 285 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *accord Kisser v. Cisneros*, 14 F.3d 615, 619 (D.C. Cir. 1994).  The arbitral board's decision must show that it "considered the relevant factors and explained the facts and policy concerns on which it relied, and whether those facts have some basis in the record."  *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 498 (D.C. Cir. 1988).  Furthermore, the arbitrator's decision is arbitrary or capricious if the arbitrator

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or is so implausible that it could not be ascribed to a difference in view or the product of [arbitrator] expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

When a court applies the arbitrary or capricious standard of review, "the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). The review is to be based on the record that was before the arbitrator at the time his decision was made. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). The Court "may not supply a reasoned basis" that the arbitrator himself has not given, but may "uphold a decision of less than ideal clarity" if the arbitrator's rationale may reasonably be discerned. *Bowman Transp.*, 419 U.S. at 285–86 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), and *Colo. Interstate Gas Co. v. Fed. Power Comm'n*, 324 U.S. 581, 585 (1945)). The Court is merely to determine whether the Board's decision was reasoned and supported by record evidence, not to substitute its judgment for that of the Board. *See State Farm*, 463 U.S. at 43.

*b. Analysis*

WMATA challenges the general wage adjustments and new subcontracting provisions as arbitrary or capricious under the Standards Act. The Court addresses each challenge in turn.

*i. General Wage Adjustments*

It is clear from the parties' briefing that the primary dispute in this litigation is the validity of the Award's inclusion of a general wage increase. Although the plain language of section 18303(b) requires the consideration of seven enumerated factors for any "finding or . . . decision for inclusion in a collective bargaining agreement[,]" 40 U.S.C. § 18303(b) (2006), the Board's written opinion and WMATA's motion for summary judgment both address the Factors mostly in the context of the general wage adjustment. The Court will therefore review the

Board's application of the Factors—as well as non-statutory considerations cited by the Board— in a similar fashion.[10]

## (A). The Prior CBA

The Court begins its arbitrary or capricious review by determining whether the Board adequately considered the factors set out in section 18303(b) of the Standards Act. *See Nat'l Treasury Emps. Union*, 854 F.2d at 498 (holding that an agency must "consider[] the relevant factors"). Factor 1 requires that the Board consider "[t]he existing terms and conditions of employment of the employees in the bargaining unit." 40 U.S.C. § 18303(b)(1). WMATA argues that, in addition to procedural deficiencies in applying Factor 1, *see supra* Part IV.B.1.b.i, the Board failed to weigh and connect the record evidence to its conclusion. *See* Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 17, ECF No. 14-1. The Award, though brief in its discussion of Factor 1, points to the prior CBA and finds that it shall serve as the "starting point" for each of

_____

[10] The Court notes an apparent tension between the Standards Act's arbitrary or capricious review and its *separate* requirement in section 18303(d)(3) that the public welfare findings be supported by substantial evidence. Because the standards are the same, *see Cablevision Sys. Corp. v. FCC*, 597 F.3d 1306, 1310 (D.C. Cir. 2010) ("We will vacate an agency's decision as arbitrary and capricious if [its] factual determinations lack substantial evidence . . . ." (first alteration in original) (internal quotation marks omitted)); *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984) ("[I]n their application to the requirement of factual support the substantial evidence test and the arbitrary or capricious test are one and the same."), the division of these two standards in the Act suggests that section 18303(d)(3) might be superfluous. However, canons of statutory construction dictate that the Court avoid construing the text in such a fashion. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 476–77 (2003) ("Absent a statutory text or structure that requires us to depart from normal rules of construction, we should not construe the statute in a manner that . . . would render a statutory term superfluous." (citing *United States v. Nordic Village, Inc.*, 503 U.S. 30, 36 (1992), and *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 258 (1993))). The Court resolves this apparent tension by noting the existence of the arbitrary or capricious standard's "harmless error" doctrine. *See Jicarilla Apache Nation v. U.S. Dep't of the Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010). If the public welfare findings are unsupported by substantial evidence but do not render an overall award arbitrary or capricious, the award may withstand scrutiny under section 18304(c)(5) but still fail under sections 18303(d)(3) and 18304(c)(7). In other words, there is no such thing as a "harmless error" in applying the public welfare factor of the Standards Act.

the terms and conditions to be included in the new contract.  *See* Award at 7.  To support its

conclusion, the Board points to the fact that "[t]he existing agreement—including the structure of

compensation—is the product of years of collective bargaining and a reflection of terms and

conditions acceptable to the parties."  *Id.*  The Board then proceeds, for the remainder of the

Award, to place the burden upon the party advocating a change from the prior CBA to show that

a change is warranted.  *See id.*  The Board's analysis of this factor is further supported by its

observation that, customarily, "the starting point for any interest [a]rbitration is the current

collective bargaining agreement and the terms and conditions established therein."  *Id.*  WMATA

does not dispute that observation, nor does it point to any probative record evidence relating to

Factor 1 that the Board failed to consider.  As the Board's discussion makes clear, pursuant to

Factor 1 the Board decided to treat the prior CBA itself *as* evidence creating a presumption in

favor of the status quo for all issues subject to the interest arbitration.

### *(B).  WMATA's Financial Resources, the Public Welfare, and Ability to Pay*

Under Factor 2, the Board must consider "[a]ll available financial resources of the

interstate compact agency."  40 U.S.C. § 18303(b)(2).  Factor 7 requires consideration of "[t]he

public welfare."  *Id.* § 18303(b)(7).  As described above, the Board considered these two factors

in conjunction, *see supra* Part IV.B.1.b.ii, and found that the awarded increases were affordable

and the public welfare would not be harmed.  Award at 12–13.  In this respect, the Board's

application of Factors 2 and 7 also encompassed the mandatory finding required by section

18303(c)—that any wage increase does not exceed the ability of WMATA or the Compact

Jurisdictions "to obtain the necessary financial resources to pay for wage and benefit

increases . . . ."  40 U.S.C. § 18303(c).

In its discussion of these factors, the Board cited WMATA's FY2011 budget, which stated that the Authority had planned "a 3.0 percent budgeted increase for unionized staff." J.A. 3673. WMATA argues that the Board's application of these factors was flawed because it "fail[ed] to identify precisely what record evidence conclusively supports [its] finding that the necessary funding was budgeted." Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 18, ECF No. 14-1. But under the arbitrary or capricious standard of review, it is not the Court's role to look for "conclusive" evidence supporting the Board's finding; it is to review for *substantial* evidence. *See Pub. Citizen Health Res. Grp. v. Tyson*, 796 F.2d 1479, 1495 (D.C. Cir. 1986) ("Our function . . . is only to search for *substantial* evidence, not proof positive."). For the same reasons described above with respect to the public welfare, *see supra* Part IV.B.1.b.ii, the Court finds that the Board's application of Factors 2 and 7, and its conclusion with respect to section 18303(c), satisfy that standard.

*(C). The Consumer Price Index*

Factor 3 requires the board to consider "[t]he annual increase or decrease in consumer prices for goods and services as reflected in the most recent consumer price index ["CPI"] for the Washington metropolitan area, published by the Bureau of Labor Statistics." 40 U.S.C. § 18303(b)(3). With respect to this factor, the Board considered data spanning several years. The Board first focused on the statistics for the years that would fall under the new contract, using the CPI data and estimates published for July of each year. *See* Award at 13. As shown in exhibits produced by WMATA, the CPI declined by 0.84 percent the first contract year, increased by 1.06 percent the second contract year, and was estimated to increase 1.75 percent

and 1.9 percent in the third and fourth contract years, respectively. *See id.*; J.A. 3739.[11] The

Board also considered Local 2's position that, based on historical data, pay has not kept pace

with inflation over the long term. *See* Award at 14. According to the statistics provided in

Union exhibits, cited in the Award, real pay for Local 2 employees was 92.8 percent of what it

had been in September 1987. *See* J.A. 1287–94. Considering this record evidence, the Board

found that the historical decrease in real pay justified a "catch-up adjustment" while the most

recent data—particularly the CPI decline in 2008—"represents an historic economic event which

cannot be ignored . . . ." *See* Award at 14. With these two opposing considerations combined,

the Board found that a modest wage increase of 2.2 percent over the entire agreement coupled

with a wage freeze in the first contract year accounted for recent economic developments while

making incremental real wage progress. *See id.* at 14–15.

According to WMATA, the Board's application of this factor was flawed because Factor

3, "[b]y its plain terms, . . . required the Board to limit its consideration of the annual increase or

decrease in consumer prices for goods and services to that contained 'in the most recent

Consumer Price Index for the Washington metropolitan area . . . .'" Pet'r's Mem. P. & A. Supp.

Mot. Summ. J. 18, ECF No. 14-1 (third alteration in original) (quoting 40 U.S.C. § 18303(b)(3)).

The Board did consider the most recent CPI data, which served as the basis for the wage freeze

in the first contract year. And while Factor 3 does require the Board to consider the most recent

data, the Board is not "limited" from considering relevant historical data. Under D.C. Circuit

case law, a decision is not arbitrary or capricious due to consideration of additional factors if

there is no congressional intent to preclude such consideration. *See Natural Res. Def. Council,*

*Inc. v. U.S. EPA*, 824 F.2d 1146, 1163 (D.C. Cir. 1987) (en banc) ("Since we cannot discern

---

[11] Although WMATA's exhibit shows a decline of 0.84 percent in the first contract year, *see* J.A. 3739, the Award erroneously states that the figure is 0.88 percent. *See* Award at 13.

clear congressional intent to preclude consideration of cost and technological feasibility in setting emission standards . . . , we necessarily find that the Administrator may consider these factors."). Because the Board rationally considered historical CPI data and real pay patterns in determining the weight to give recent CPI data, the Court finds that the Board did not act arbitrarily in discussing both sets of data in relation to Factor 3.

*(D). Wages of Other Employees in the D.C. Area*

Factor 4 requires the Board to consider "[t]he wages, benefits, and terms and conditions of the employment of other employees who perform, in other jurisdictions in the Washington standard metropolitan statistical area, services similar to those in the bargaining unit." 40 U.S.C. § 18303(b)(4). The Board first considered a market study submitted by WMATA, which compared Local 2 member salaries to the salaries of employees of ten other public sector employers. *See generally* J.A. 3805–44. Because the Authority did not find it practical to collect salary information on all job titles, it relied on data for 27 "benchmark" titles, which purportedly represented 65 percent of the Local 2 population. *See* J.A. 3810. The study concluded that Local 2 members already received a salary "premium" of 32 percent at the minimum rate, 24 percent at the midpoint, and 19 percent at the maximum. *See* J.A. 3833. WMATA also submitted evidence showing that seven out of the ten selected governmental jurisdictions provided zero across-the-board annual wage increases for the second contract year (ending June 30, 2010), and that nine[12] out of ten had determined that they will provide zero increases for the third contract year. *See* J.A. 3727. The Board also considered the Union's evidence and

_____

[12] The written award and WMATA's arbitration brief both state that all ten jurisdictions determined that they will provide zero across-the-board wage increases for the third contract year, *see* Award at 16; J.A. 6131–32, but the cited record evidence indicated that the jurisdiction of Prince George's County had not yet determined its pay structure for the third contract year. *See* J.A. 3727, 6131.

argument, which posited that the only area employees comparable to Local 2—whose job performance requires specialized computer support, mechanical and civil engineering, and construction activities for the only transit railroad in the D.C. area—are the consultants and contractors WMATA hires to perform Local 2 work. *See* Award at 16. Local 2 also pointed to a survey by the Human Resources Association of the National Capital Area ("HRA-NCA") purportedly showing that pay increases were in the 4.0 to 4.5 percent range. *See* J.A. 1717–1745.

But the Board found that the record evidence was insufficient to draw a conclusion in either direction. First, the Board found that "true comparability is questionable" because "numerous Local 2 classifications are peculiar to the Authority's systems[,] and others outside WMATA with similar job titles do not necessarily perform similar services . . . ." Award at 17. The Board further observed that "salary levels among professionals within the same occupation vary considerably . . . ." *Id.* The Board also noted that WMATA management itself controls the categorization of job classifications into the established pay grades and that the existing salaries therefore reflected WMATA's own assessment of the pay necessary to recruit and maintain individuals with satisfactory skills. *See id.* at 17–18. Finally, the Board found that WMATA's analysis was not representative of the local labor market, because it relied on a small sample size of just ten employers, all of whom are public sector employers. *See id.* at 18. In the end, factor 4 "d[id] not weigh heavily" on the Award. *Id.*

The Court does not find that the Board acted arbitrarily or capriciously in its application of Factor 4. The Board considered evidence put forth by each party and gave a reasoned basis for concluding that the factor should not be given much weight in the Award. *See also ValueVision Int'l, Inc. v. FCC*, 149 F.3d 1204, 1210 (D.C. Cir. 1998) ("When an agency

considers a particular factor and rationally concludes that it should not affect its decision, the agency is not acting arbitrarily."). WMATA points to no additional evidence that the Board should have considered, but argues that the Board misapplied this factor because WMATA's market study was "unrefuted" and the Board's decision to discount it was not supported by substantial evidence. *See* Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 19, ECF No. 14-1. But as is clear from the Board's written opinion, WMATA's study *was* refuted, both by competing data contained in the HRA-NCA survey and by the Union's (and Board's) observation that the data WMATA chose to sample was not representative of either the diversity of employers in the D.C. area or "peculiar" job classifications applicable to Local 2. *See* Award at 16–18. In summarizing the Union's position, the Board cited Local 2's post-hearing briefing in which it argued that there are few other employees performing the same services as Local 2 members. *See id.* at 16. The cited pages provide statistics and refer to exhibits showing the specialized and professional nature of the Local 2 members' work. *See* J.A. 6230–31. Although the Board's discussion would ideally have been clearer, it is apparent from the written opinion that the Board credited the Union's evidence in finding that many Local 2 jobs involved duties that are exclusive to WMATA and are thus not comparable to others in the market. It is unreasonable for WMATA to argue that its own evidence is "unrefuted" when the written opinion contained several pages balancing evidence from both sides and offering a reasoned conclusion.

WMATA also argues that the Board's application of Factor 4 was arbitrary because it "cites no record evidence that would support a conclusion that annual wage increases of 3% for fiscal years 2010–2012 were the norm within the [D.C.] area for employees performing similar services to those performed by the employees in the Local 2 bargaining unit . . . ." Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 19, ECF No. 14-1; *see also id.* at 38–39 ("The most telling fact,

which is fatal to the enforceability of the [Award], is that the Board was unable to cite a shred of record evidence that would support a conclusion that the annual base wage increases of 3% . . . for Fiscal Years 2010–2012 were the norm within the statutorily prescribed geographic area . . . .").  But that is a straw man argument, as the Board did not conclude that such increases were the norm and, in fact, found that the record evidence for Factor 4 was inconclusive.  *See* Award at 17–18.  WMATA appears to misapprehend the Board's duty under the Standards Act, the Board's actual findings, or both.  The Act does not require the Board to make any particular finding regarding wage comparisons, *cf.* 40 U.S.C. § 18303(d)(2) (requiring particular *public welfare* findings as a prerequisite to a wage increase), and the Board does not need to support a conclusion it did not in fact draw.

### (E).  The "Special Nature" of Local 2 Employees' Work

Factor 5 requires the Board to consider "[t]he special nature of the work performed by the employees in the bargaining unit, including any hazards or the relative ease of employment, physical requirements, educational qualifications, job training and skills, shift assignments, and the demands placed upon the employees as compared to other employees of the interstate compact agency."  *Id.* § 18303(b)(5).  The Board interpreted this requirement as "intended to give weight to the 'special nature' or unique content of the jobs performed by the arbitrating employees in connection with the Arbitrator's determination of appropriate comparisons called for by Factor 4 and others."  Award at 18.  Under the Board's reading, the phrase "as compared to other employees of the interstate compact agency" qualifies only "the demands placed upon the employees" and not the other elements listed in the factor.[13]  *Id.*  With respect to this latter

---

[13] Although the Board's written opinion does not state the basis for this reading of the statutory factor, the Court notes that it is consistent with the "last antecedent rule" of statutory interpretation, because the two phrases are not separated by a comma.  *See also* 2A Norman J.

element of Factor 5, the Board indicated that its discussion comparing Local 2 to other WMATA employees would fall under its discussion of "internal patterns." *See id.* at 18–19. For the remaining elements, the Board cited its Factor 4 discussion and reiterated that it has "determined that the bulk of WMATA's Local 2 employees perform services which are peculiar to WMATA in the local area—given their specialized job training and skills in maintaining and constructing a railroad." *Id.* at 18.

WMATA asserts that the Board violated the Standards Act in its application of this factor "by folding its consideration of Factor 5 into its discussion of an improper non-statutory consideration." Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 19, ECF No. 14-1. In doing so, WMATA argues that the Board failed to discuss and apply the factor, weigh the evidence, and explain its reasoning. *See id.* at 19–20. As the Court describes in greater detail below in reference to the "internal patterns" factor, *see infra* Part IV.B.2.b.i.(G), there is no legal basis to find error in the Board's discussion of a statutory factor alongside non-statutory factors. To the extent that WMATA raises a substantive challenge to the Board's application of evidence to Factor 5, the written opinion's incorporation of its Factor 4 discussion indicates that the Board considered the same evidence—namely, the market study, HRA-NCA survey, and the comparability of the jobs contained in those reports—in finding that the Local 2 employees' work was of a "special nature" compared to others in the D.C. area labor market. The Board also relied on the evidence cited in its "internal patterns" discussion. The Court finds that the Board did not arbitrarily apply Factor 5.

---

Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* § 47:33 (7th ed. 2011) ("Evidence that a qualifying phrase is supposed to apply to all antecedents instead of only to the immediately preceding one may be found in the fact that it is separated from the antecedents by a comma.").

*(F).  Employee Interests and Welfare*

For Factor 6, the Board must consider "[t]he interests and welfare of the employees in the bargaining unit . . . ."  40 U.S.C. § 18303(b)(6).  This factor includes the employees' overall compensation and benefits, as well as the continuity and stability of their employment.  *See id.* The Board noted in its written opinion that its "review of the record does not reveal a specific reference to Factor 6 in either parties' [sic] case before the Board."  *See* Award at 19.  In the absence of specific evidence offered by the parties for the employee interest factor, the Board turned to the prior CBA and found that "the employees' interests are adequately served by the current level of compensation and stability of employment" because "total compensation has been established through voluntary agreement in recognition of mutual interests."  *Id.*  The Board also reasoned that this factor "permits the consideration of the employees' interests and welfare compared to employees in the local labor market and within WMATA."  *Id.*  And in its closing remarks on the wage adjustment issue, the Board determined that "common terms provide fair treatment of all employees and promotes labor relations stability by preventing 'leap-frogging.'" *Id.* at 20.

On appeal, WMATA points to no specific probative evidence that the Board failed to consider but nonetheless argues that the Board's analysis of this factor was insufficient because it failed to tie any evidence to its conclusion.  *See* Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 20, ECF No. 14-1.  It is disingenuous for a party to decline to offer any evidence relating to a particular factor and then complain on appeal that the Board's application of that mandatory factor does not cite to sufficient evidence.  And to the contrary, in spite of the parties' apparent failure to offer evidence relating specifically to Factor 6, the Board *did* refer to what evidence it could—the prior CBA, which was entered into voluntarily and serves as the starting point for the

44

new contract, *see supra* Part IV.B.2.b.i.(A)—in finding that the employees' interests were adequately served by the terms to which they had voluntarily agreed several years earlier. The Court finds the Board's application of Factor 6—though somewhat thin due in large part to the parties' own failure to create a sufficient record—adequate for purposes of arbitrary or capricious review and consistent with the Board's application of Factor 1.

### *(G). Internal Patterns*

In addition to the seven factors mandated by the Standards Act, the Board considered a factor it refers to as "internal patterns"—the terms and conditions governing Local 2 employees as compared to other WMATA employees. *See* Award at 20–21. Under this factor, the Board pointed to WMATA's bargaining history with its unions and found that "for 25 years covering all rounds of bargaining between WMATA and Local 2, the overall wage change for Local 2 has been identical to Local 689." *Id.* at 21 (emphasis omitted). In support of its finding, the Board cited a Union exhibit that provides a side-by-side comparison of the two unions' wages over time. *See* J.A. 1316–17. Although the Board's finding that the overall wage change was "identical" was an overstatement because the increases differ by a small fraction, *see* J.A. 1317, WMATA does not dispute that wage increases for the two unions have historically kept relative pace with one another. The Board gave "considerable weight" to these internal patterns in issuing a general wage increase that matched the Kasher Award for Local 689. *See* Award at 21. Although it does not dispute the validity of the conclusion drawn from evidence of internal patterns, WMATA argues that the Board's reliance on a factor not enumerated in the Standards Act renders the award arbitrary or capricious. *See* Pet'r's Mem. P. & A. Supp. Mot. Summ. J.

29–30, ECF No. 14-1.[14]  Specifically, WMATA contends that the Board impermissibly went beyond the Act's statutory factors and "relied on factors which Congress had not intended it to consider . . . ."  *Id.* at 30 (quoting *State Farm*, 463 U.S. at 43).

A congressional mandate to consider particular factors does not preclude the consideration of non-enumerated factors unless Congress intended so.  In *Natural Resources Defense Council, Inc. v. United States Environmental Protection Agency*, 824 F.2d 1146 (D.C. Cir. 1987) (en banc), the D.C. Circuit convened en banc to determine whether the Clean Air Act's mandate that the Administrator of the Environmental Protection Agency set emissions standards "at the level which in his judgment provides an ample margin of safety to protect the public health" left room for the Administrator to consider factors other than the public health in setting a standard.  *Id.* at 1147 (quoting 42 U.S.C. § 7412(b)(1)(B) (1982)).  The Administrator had considered the additional factors of cost and technical feasibility.  *See id.* at 1154.  After finding no congressional intent to preclude such factors on the face of the statute, its legislative history, or in its structural coherence, the court concluded that it was not arbitrary or capricious for the Administrator to consider them.  *See id.* at 1155–63.  Here, the Court finds no congressional intent in the Standards Act—and WMATA cites no evidence of any—to preclude consideration of internal patterns.  Section 18303(b) merely requires that the Board "may not make a finding or a decision for inclusion in a collective bargaining agreement governing conditions of employment without considering" the seven enumerated factors.  40 U.S.C. § 18303(b).  There is no exclusionary language in that section specifying that only consideration of the seven factors is allowed, nor is consideration of additional factors inconsistent with the

---

[14] Although WMATA does not use the terms "arbitrary" or "capricious" in challenging the Board's application of the internal patterns factor—nor is the precise statutory basis for the Authority's challenge clear from its briefing—the Court infers from WMATA's citation to the landmark *State Farm* case that the challenge falls under arbitrary or capricious review.

structure set forth by the Standards Act.  Moreover, there is no evidence in the legislative history to support a finding that the Board is precluded from considering internal patterns.  As the Maryland court noted, "[t]he statute's legislative history is thin to the point of virtual non-existence."  *Local 689 I*, 818 F. Supp. 2d at 901.  And because the Standards Act reforms an existing arbitral system in which internal patterns and other factors were routinely considered, the Court finds the absence of exclusionary language particularly probative.  If Congress knew such factors were previously being considered and intended to foreclose the practice, the statutory text would likely be clear in that regard.  The Board's consideration of internal patterns was not erroneous.

### *(H).  Overall Balancing of Factors*

Finally, the Court also considers whether the Board's overall conclusion is arbitrary or capricious in light of the intermediate conclusions it reached as to the Standards Act's seven factors and other considerations.  Although the Board did not find every factor to support an increase in wages, such a burden is imposed by neither the statute nor reason.  The overall decision to award a wage increase was reasonable in light of the Board's conclusions that some increase was affordable and the Union's real wages have decreased over time.  And the 3 percent number, which represents a downward departure from the Union's requested increase, was rational in view of the Kasher Award and the Board's findings regarding internal patterns and the Authority's budgeting for some increase.

WMATA's briefing does not frame its arguments in terms of whether a reasonable mind would have arrived at the Board's conclusion, instead opting to re-argue the appropriate weighing of the evidence and make representations that the Board "ignored" certain key evidence—or entire factors—that it did in fact address.  If there is significant evidence that the

Board did not address, WMATA does not bring it to the Court's attention. The arbitral record in this case is voluminous, and courts need not consider unarticulated evidentiary theories at the summary judgment stage "not only because judges are not like pigs, hunting for truffles buried in briefs or the record, but also because such a rule ensures fairness to both parties." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 137 (D.C. Cir. 2011) (Tatel, J., concurring) (citations omitted) (internal quotation marks omitted). Overall, based on the evidence cited by the Board and the parties in their briefing, the general wage adjustment satisfies the arbitrary or capricious standard.

That is not to say that the Court is not given pause by certain aspects of the Award. *See generally Bowman Transp.*, 419 U.S. at 286 (noting that, in certain circumstances, a court may "uphold a decision of less than ideal clarity"). It does not escape the Court's attention that the language of the Board's written opinion, in many instances, tracks almost verbatim the analysis put forth by the Kasher Board in its second supplemental opinion. *See generally Local 689 I*, 818 F. Supp. 2d; *Local 689 II*, 804 F. Supp. 2d. Several Standards Act factors are party-specific, and Local 689 is a very different union from Local 2 in terms of size, profession, and salary level. Although the Board did address record evidence and connect the evidence to its conclusions regarding Local 2, the Court expected greater assurance that the Board was implementing its own critical view of the arbitral record and not merely adopting the result of a different award that happened to survive judicial scrutiny. But absent a showing, based on the record, that the Board acted arbitrarily or capriciously, the Court does not find it appropriate to vacate the general wage adjustment under section 18304(c)(3).

WMATA devotes a mere footnote to its argument that the Board's decision to grant new subcontracting provisions was arbitrary or capricious.  *See* Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 42–44 n.31, ECF No. 14-1.  In particular, WMATA challenges paragraph 3 of the awarded subcontracting terms, which provides:

> Within 30 days of the date of this Award, a permanent joint Labor/Management Contracting Committee shall be established to review existing and proposed subcontracting practices at the Authority, with the goal of bringing work in-house on a cost saving or cost neutral basis.  The committee shall have the authority to appoint subcommittees as necessary to review specific contracts and/or categories of work.

Award at 26.  According to WMATA, the decision to award paragraph 3 was arbitrary or capricious because the parties never bargained over those specific terms, and the decision therefore "was made without the benefit of any record evidence as to the merits of the awarded provision."  *See* Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 42 n.31, ECF No. 14-1.

The Court finds that the awarded subcontracting terms were neither arbitrary nor capricious in light of the Board's finding, based on the record, that WMATA did not fully comply with the prior CBA's subcontracting terms.  The Board's written opinion notes that "[d]uring the course of the previous contract, the issue of 'contracting out' bargaining unit work became contentious between the parties."  Award at 25.  The prior CBA had provided that "[w]ork which is normally or customarily performed by the bargaining unit shall not be subcontracted by the Authority to any outside source or agency except after consultation with the Union and after reasonable efforts to minimize the impact or necessity of any layoff."  J.A. 1069–70.  The Board reviewed record evidence and found that WMATA laid off Local 2 members and later contracted out the work without ever consulting the Union.  *See* Award at 25.  Although the written opinion cites only to evidence offered by Local 2, WMATA cites no

additional evidence on appeal and takes the position that there is no record evidence.[15]  *See*

Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 42 n.31, ECF No. 14-1.  The creation of a joint

committee to review subcontracting practices is reasonably related to the Board's evidence-

backed finding that WMATA did not fully comply with the prior CBA's consultation

requirements.

### 3.  Excess of Power

Under the Standards Act, a court must vacate an award provision if "the arbitrator

exceeded the arbitrator's powers" in awarding it.  40 U.S.C. § 18304(c)(2) (2006).  WMATA's

remaining challenges to the Moffett Award relate to the new subcontracting provisions and pay

bands, which WMATA urges were outside the scope of the Board's authority to award.  Local 2

argues that courts generally defer to an arbitral board's determination as to whether an issue is

arbitrable and within the scope of the submitted dispute.  *See* Resp't's Mem. Supp. Mot. Dismiss

Pet. & Conf. Arb. Award 24, ECF No. 13-1.  Because WMATA did not challenge the Kasher

Award under section 18304(c)(2) as part of the Maryland litigation, the Court applies this

provision of the Act not only as a matter of first impression in *this* jurisdiction, but in *any*

jurisdiction.

---

[15] Notwithstanding WMATA's assertion that there is no record evidence, the Court's review of the arbitral record reveals that WMATA did, in fact, cite evidence in its post-hearing brief to counter Local 2's accusations that WMATA breached the prior CBA.  *See* J.A. 6202. However, the Court finds that the Board's omission of this evidence from its written opinion is not fatal to the Award's validity because WMATA's evidence was not relevant to the Board's finding that there were enforcement problems with the prior CBA's subcontracting provisions. WMATA put forth evidence before the Board suggesting that the Local 2 members were laid off as part of normal reductions in force and not as a result of a decision to subcontract out the work. *See, e.g.*, J.A. 786–90 (Arb. Tr. 1819:5–1835:21, Oct. 27, 2010).  But WMATA's duty to consult the Union under the prior CBA was triggered when it made the decision to subcontract out work customarily performed by Local 2, not merely when layoff decisions were made.  *See* J.A. 1069– 70.  WMATA cites no record evidence disputing the Union's evidence by showing that subcontractors were not performing Local 2 work, or that WMATA did consult with the Union before contracting out the work.

*a. Standard of Review*

WMATA's challenge under section 18304(c)(2) of the Standards Act encompasses two issues: first, whether the language of the Compact itself *allows* the issue of subcontracting to be submitted to arbitration; and second, whether the subcontracting terms and pay bands awarded were within the scope of the dispute *actually submitted* for arbitration. These issues— arbitrability and the scope of the submission to the arbitrator—constitute separate legal questions, *see Madison Hotel v. Hotel & Rest. Emps., Local 25*, 144 F.3d 855, 857 n.1 (D.C. Cir. 1998) (en banc), and warrant separate consideration. While section 18304(c)(2) requires the Court to vacate the Award if the Board exceeded its authority, it provides no explicit standard for the Court to apply. The Court will thus look to the standards applied in judicial review of arbitral awards outside of the Standards Act context.

With respect to arbitrability of the subcontracting terms, the parties agree that the analysis is controlled by Section 66(c) of the Compact, which only grants the arbitration board jurisdiction over "labor disputes." However, the parties disagree over the deference a reviewing court owes to an arbitrator's determination of arbitrability. WMATA does not explicitly advocate a standard of review but, by disputing the Board's authority solely by reference to the Compact itself, apparently supports a *de novo* standard. Local 2, quoting *National Postal Mail Handlers Union v. American Postal Workers Union*, 589 F.3d 437, 441–42 (D.C. Cir. 2009), argues that "[t]he Supreme Court's deferential standard of judicial review applies not just to a labor arbitrator's determination on the *merits*, but also to the arbitrator's threshold decision that the dispute was *arbitrable*, at least so long as the parties agreed contractually or by consent to present the question of arbitrability to the arbitrator." *See* Resp't's Mem. Supp. Mot. Dismiss Pet. & Conf. Arb. Award 24, ECF No. 13-1. But here, WMATA *does* dispute whether the

parties agreed that the topic of subcontracting is arbitrable, and the Compact does not explicitly authorize the arbitrator to determine arbitrability.[16] The Supreme Court has held that arbitrability is an issue for judicial determination unless the parties express otherwise in the clearest of terms: "[T]he question of arbitrability . . . is undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). This is so because "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance" to arbitration of a particular issue. *Id.* at 648. In the context of judicial review of labor arbitral awards, if "an arbitration agreement does not say who is to decide the question of arbitrability and the parties do not otherwise consent to arbitration of that question, then arbitrability is an issue for *de novo* judicial determination." *See Nat'l Postal Mail Handlers Union*, 589 F.3d at 442. Because there is no clear evidence of consent here, the Court will therefore review arbitrability *de novo*.

Separate and apart from the issue of arbitrability under the Compact itself, the Court must also consider the standard of review applicable to the arbitrator's determination of the scope of the issues submitted for arbitration. "[T]he scope of an arbitrator's authority is limited to those subjects the parties intend *to submit to arbitration*." *Madison Hotel*, 144 F.3d at 860 (Henderson, J., concurring); *accord Williams v. E.F. Hutton & Co.*, 753 F.2d 117, 119 (D.C. Cir.

---

[16] Local 2 argues, without citation or analysis, that "[t]here is no doubt whatsoever that 'arbitrability' is a 'labor dispute' within the meaning of the WMATA Compact, Section 66(c) and, thus, itself consigned to arbitration." Resp't's Mem. Supp. Mot. Dismiss Pet. & Conf. Arb. Award 24, ECF No. 13-1. The Court rejects the Union's proposition, as the Compact language is not explicit. Of the many issues described as subject to arbitration, arbitrability itself is not identified as an issue for the arbitrator to decide. *See* Compact § 66(c); *see also First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944–45 (1995) (holding that, where a contract is silent or ambiguous as to who should determine arbitrability, the presumption favors independent judicial review).

1985) ("There is no duty to arbitrate matters not subject to the arbitration agreement, and no authority on the part of arbitrators to consider matters not necessary to the resolution of disputes actually submitted." (citations omitted)); *Wash.–Balt. Newspaper Guild, Local 35 v. Wash. Post Co.*, 442 F.2d 1234, 1236 (D.C. Cir. 1971) ("In determining the scope of an arbitrator's authority we look to two sources:  the collective bargaining agreement, and the submission of the parties to the arbitrator.").  However, in contrast to the arbitrability issue, courts have regularly held that traditional deference applies to the arbitrator's determination of the scope of the submission.  *See Madison Hotel*, 144 F.3d at 857 & n.1.  The Court finds that the Standards Act's mandates have not changed the common law standard on this particular issue.  As noted above, the Act does not expressly abrogate the standard of review as it relates to an arbitrator's determination of his authority.  *Cf.* 40 U.S.C. § 18304(c)(3) (setting an explicit arbitrary or capricious standard of review for substantive review of the arbitrator's decision).

The Court finds further support for its interpretation in cases applying the Federal Arbitration Act ("FAA").  Under language nearly identical to the Standards Act, a reviewing court will vacate an arbitration award under the FAA "where the arbitrators exceeded their powers . . . ." 9 U.S.C. § 10(a)(4) (2012).  Courts applying the FAA have adopted the same split standard of review used in common law:  arbitrability is reviewed *de novo*, and the scope of the submission receives deference.  *See, e.g.*, *Burlington N. & Santa Fe Ry. Co. v. Pub. Serv. Co. of Okla.*, 636 F.3d 562, 569 (10th Cir. 2010) ("After the district court independently concluded the parties' rate dispute was arbitrable, it correctly applied a deferential standard of review to the board's determination of the scope of its authority.").  The Court will therefore apply this "split" standard to its review of the Moffett Board's authority under the Compact and the Standards Act.

*b. Analysis*

WMATA challenges the new subcontracting terms as not arbitrable under the terms of the Compact, and both the subcontracting terms and new pay bands as outside the scope of the parties' actual submissions. The Court will first address the threshold issue of arbitrability, then the scope of the submitted dispute.

*i. Arbitrability*

Section 66(c) of the Compact requires arbitration of "any labor dispute involving the Authority and such employees where collective bargaining does not result in an agreement." Compact § 66(c). "The term 'labor dispute' shall be broadly construed and shall include any controversy concerning wages, salaries, hours, working conditions, or benefits . . . , and includ[e] any controversy concerning any differences or questions that may arise between the parties including but not limited to the making or maintaining of collective bargaining agreements [and] the terms to be included in such agreements . . . ." *Id.* Local 2 argues that subcontracting is a component of job security and falls under the "working conditions" arbitrable under section 66(c). *See* Resp't's Mem. Supp. Mot. Dismiss 27, ECF No. 13-1. WMATA contends that sections 12(g), (i) and (m) of the Compact grant WMATA core entrepreneurial powers that are not subject to arbitration of labor disputes under section 66(c), including the right to contract for professional services. *See* Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 42, ECF No. 14-1. In order to resolve this dispute, the Court must determine whether the contractual language creating a duty to arbitrate encompasses subcontracting terms. *See John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 547 (1964) ("The duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty.").

The Court is unaware of any case in which arbitrability of a dispute has been challenged under section 66(c), and therefore resolves the issue as a matter of first impression. When interpreting a statute or contract, courts first resort to the plain meaning of the text. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997); *United States v. Barnes*, 295 F.3d 1354, 1359 (D.C. Cir. 2002). The Court applies the Compact's plain meaning here, mindful of the D.C. Circuit's earlier observation that under section 66(c), "[b]ecause 'labor dispute' is so broadly defined, a vast range of nontraditional issues are subject to arbitration." *Office & Prof'l Emps. Int'l Union, Local 2 v. WMATA*, 724 F.2d 133, 137 (D.C. Cir. 1983).

The Court finds that under the plain language of section 66(c), the mandate to submit labor disputes to arbitration limits the powers granted to WMATA in section 12 to contract for employment. In addition to mandating that labor disputes be submitted for arbitration, section 66(c) further explains that "'labor dispute' shall be broadly construed . . . including any controversy concerning any differences or questions that may arise between the parties including but not limited to the making or maintaining of collective bargaining agreements [and] the terms to be included in such agreements . . . ." Compact § 66(c). Section 12 of the Compact, however, begins with limiting language specifying that the Authority is empowered to engage in the listed activities "except as limited in this Title . . . ." *Id.* § 12. While WMATA is correct that section 12 enables the Authority to "[c]reate and abolish offices, employments and positions" and "[c]ontract for or employ any professional services[,]" the powers enumerated in section 12 are "limited" by other provisions like section 66(c), which has no such limiting language. *Id.* § 12(g), (i). Section 66(c)'s limiting power over section 12 is further evident when looking to the section 12 powers WMATA omits from its briefing. Section 12 allows WMATA to "fix and provide for the qualification, appointment, removal, term, tenure, *compensation, pension and*

*retirement rights* of its officers and employees . . . ," a power that clearly encompasses arbitrable subject matter. *Id.* § 12(g) (emphasis added). Section 12 therefore cannot be read as a list of entrepreneurial powers immune from arbitrability.

WMATA has insisted that it is "not arguing that the matter of subcontracting generally is beyond the scope of collective bargaining[,]" Pet'r's Resp. Mot. Summ. J. 14 n.6, ECF No. 16, and has bargained over and agreed upon subcontracting terms in the expired CBA, *see* J.A. 1069–70. If subcontracting is an acknowledged subject of collective bargaining during the creation of labor agreements, then according to the definition of arbitrable labor disputes in section 66(c), subcontracting is subject to arbitration. *See* Compact § 66(c) ("The term 'labor dispute' shall be broadly construed and shall include . . . any controversy concerning any differences or questions that may arise between the parties including but not limited to the making or maintaining of collective bargaining agreements [and] the terms to be included in such agreements . . . .").

The Court notes that its reading of the Compact's text aligns with the presumptions that have been articulated in case law. The Supreme Court has ruled on the balance between management rights and arbitration clauses and has found a presumption to arbitrate in the absence of an express provision excluding the contested issue from arbitration. *See United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83 (1960). ("An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."). Following the presumption to arbitrate, in that case, a subcontracting grievance was found arbitrable under a provision stating "if 'differences' arise or if 'any local trouble of any kind' arises, the [arbitration] grievance

procedure shall be applicable" despite the language that "matters which are strictly a function of management shall not be subject to arbitration." *Id.* at 583. An explicit provision excluding enumerated inherent management rights from collective bargaining contracts, like the one in *Local 589, Amalgamated Transit Union v. Massachusetts Bay Transportation Authority*, 467 N.E.2d 87, 93 (Mass. 1984), may exclude subcontracting from arbitration procedures if subcontracting is a clearly reserved inherent management right. *Warrior & Gulf*, 363 U.S. at 584. But there is no such exclusion or express reservation here.

The Court finds further support for its interpretation of the Compact in other areas of labor law. In *Fibreboard Paper Products Corp. v. National Labor Relations Board*, 379 U.S. 203 (1964), when determining if contracting out for employment fell within the National Labor Relations Act's ("NLRA") list of issues subject to collective bargaining, enumerated as "wages, hours, and other terms and conditions of employment," the Supreme Court found that subcontracting work done by bargaining unit members—and, especially, terminating members as a result of subcontracting—is a condition of employment. *Id.* at 204 & n.1, 210. With even less guidance from the NLRA's text determining the scope of "terms and conditions of employment" than is given in the Compact regarding labor disputes, the Supreme Court found that "contracting out" work performed by the established bargaining unit did fall under the scope of mandatory collective bargaining. *See id.* at 210.

Finally, the Court finds further support for its reasoning by recognition of the fact that WMATA is an administrative agency lacking the power to carry out any function that it is not empowered by statute to do so. *See Killip v. Office of Pers. Mgmt.*, 991 F.2d 1564, 1569 (Fed. Cir. 1993) ("An agency is but a creature of statute. Any and all authority pursuant to which an agency may act ultimately must be grounded in an express grant from Congress."). That purpose

is still served after the Court's finding that the listed powers are not immune from arbitration. Rather than render section 12 meaningless, the Court recognizes that the provision authorizes a government agency to carry out the listed functions subject to other restrictions enumerated in the Compact. The Court therefore finds that subcontracting terms may be submitted to interest arbitration under section 66(c) of the Compact.

### ii. Scope of Submission to the Arbitrator

Having determined that the dispute is arbitrable, the Court now considers whether the Moffett Board, in issuing its Award, exceeded the scope of the issues submitted for arbitration. WMATA challenges two award provisions on this basis: the creation of a joint committee to review subcontracting procedures, and the peopling of new pay bands. *See* Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 39–44, ECF No. 14-1. At the onset of arbitration, WMATA's counsel stated, and Local 2 did not dispute, that the arbitrator is authorized to "pick and choose from among the last best offers that have been presented by the parties and/or to modify those offers in his judgment provided that the board does not either retreat or advance to a position beyond the parameters that have been identified by the parties as being appropriate for resolution of the continuing bargaining dispute." J.A. 5–6 (Arb. Tr. 20:18–21:3, July 8, 2010). As noted above, the Court views with deference the Board's determination of the scope of issues submitted for arbitration.

### (A). Subcontracting Provisions

WMATA argues that the Board exceeded its authority by creating a joint committee to review subcontracting practices because neither party's best final offer included a request for the "creation of a joint affirmative effort to displace existing subcontractor employees with additional Local 2 personnel." Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 40–41, ECF

No. 14-1.  Local 2 argues that the Award's subcontracting language supplements the existing layoff and recall language in the previous agreement's Article VIII, sections 8 and 9, which call for "a recall list of laid off employees and certain recall rights before other hiring occurs." Resp't's Mem. Supp. Mot. Dismiss 28, ECF No. 13-1 (citing J.A. 1084–85).  The Union argues that the subcontracting language in the Award is more limited than the related Local 2 proposal, which would have "required extensive prior dealings by the Authority with Local 2" before subcontracting could proceed.  *Id.* at 29.

As a general matter, an arbitrator's discretion to modify the parties' proposals is quite wide.  In *American Postal Workers Union, Milwaukee Local v. Runyon*, 185 F.3d 832 (7th Cir. 1999), an arbitration award was challenged for exceeding the arbitrator's authority by going beyond the scope of the parties' submissions.  *Id.* at 835.  The parties asked the arbitrator to either accept or deny the management's proposed contract amendment, and the arbitrator awarded a more limited provision "reflect[ing] the spirit" of the proposal without "utiliz[ing] its precise language."  *Id.* at 836.  Because neither party explicitly limited the arbitrator's role to adopting the proposal verbatim or denying it entirely, the court held that this modification of the proposal was within the arbitrator's authority.  *See id.*

Here, Local 2 asked for a provision requiring the Authority to "provide written notice to the Union not less than thirty (30) days prior to advertising for any consultant service contracts" including "the scope of the work to be performed, a list of all of the positions or job titles and job descriptions and hourly rate of those expected to do the work[,]" and would require all subcontracted positions' wages to be less than 150% of the wage of comparable bargaining unit members.  J.A. 1198.  Local 2's proposal would also have required that this process of written

notification be completed, including grievance and arbitration when necessary, before subcontracting could occur.  *See id.*

In addition to requiring qualified laid-off workers to be recalled prior to subcontracting, the Award provides that "a permanent joint Labor/Management Contracting Committee shall be established to review existing and proposed subcontracting practices at the Authority" with the "authority to appoint subcommittees as necessary to review specific contracts and/or categories of work."  Award at 26.  The Award explains this joint committee would further the goal to keep work "in-house on a cost saving or cost neutral basis."  *Id.*

Similar to the Local 2 proposal, the Moffett Award encourages Union input in subcontracting decisions through an official mechanism in the form of a committee, rather than written notice to the Union regarding each subcontracting position and the explicit cap on subcontracting wage rates that Local 2 proposed.  Given the great deference afforded the arbitrator in determining the scope of the question submitted, *see Madison Hotel*, 144 F.3d at 857, especially regarding interest arbitrations, *see Local 58, Int'l Bhd. of Elec. Workers v. Se. Mich. Chapter, Nat'l Elec. Contractors Ass'n, Inc.*, 43 F.3d 1026, 1030 (6th Cir. 1995), and the fact that neither party explicitly *limited* the scope of the arbitration to exclude the formation of a joint committee regarding subcontracting practices, the Board was acting within its discretion by modifying the proposed mechanism to review subcontracting procedures and did not exceed its authority.

To the extent that WMATA challenges the institution of *any* "effort to displace existing subcontractor employees" as being outside of the scope of the parties' submissions, Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 40–41, ECF No. 14-1, the Court notes that Local 2's proposal applied "to any renewals of existing subcontracting arrangements as well as all subsequent

subcontracting arrangements." J.A. 1198. Although the Union explicitly acknowledged that its proposal "shall not apply to existing subcontracting arrangements," *id.*, the Board's requirement that the joint committee merely "review existing and proposed subcontracting practices" still falls within the parameters of the Local 2 proposal. The Award does not require the committee to void existing subcontracts, but rather to review existing subcontracting *practices*. This falls within the scope of the renewal language submitted by Local 2 and is therefore a valid exercise of the arbitrator's power.

WMATA's fixation on the Board's creation of a "permanent" joint committee, *see* Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 43, ECF No. 14-1, is similarly misplaced. While it is possible that WMATA is correct in asserting that no board is empowered to "*permanently* maintain any provision of [its] collective bargaining agreement[,]" *id.*, that is not what the Board has done here. The Award was, by its plain terms, limited in duration and terminated on June 30, 2012. *See* Award at 28. From that point on, a new CBA would presumably take its place containing its own subcontracting terms or none at all. The Union is correct in noting that the Award's use of the word "permanent" likely indicates that the Board envisioned a standing committee—not an ad hoc committee created for each individual subcontracting decision—and that the parties would be entitled to bargain or arbitrate the continuing existence of the committee in the next round of negotiations. *See* Resp't's Mem. Supp. Mot. Dismiss Pet. & Conf. Arb. Award 29 n.6, ECF No. 13-1. The Court therefore finds that the awarded subcontracting terms are not outside the scope of the Board's authority.

*(B). New Pay Bands*

WMATA also challenges the Board's placement of specific individuals within the newly created pay bands—a provision that neither party included in their final offers. *See* Pet'r's Mem.

P. & A. Supp. Mot. Summ. J. 43–44, ECF No. 14-1.  Local 2 argues that the Award created "the

lower two of the four proposed new TA pay scales, and directed the placement of [sic] therein of

certain specific 'over scale' employees" whose salaries were previously "red circled" as a result

of the Wolf award.  Resp't's Mem. Supp. Mot. Dismiss 29, ECF No. 13-1; *see also supra* note 4

(describing the Wolf award).

The Moffett Award requires that "[i]ncumbents subject to paragraph 3 of the 'Wolf'

award . . . shall be placed at the pay grade immediately above [their] current pay, unless such

individual's current pay exceeds the newly created Grades 25 and 26 in which case the

individual shall continue to be red-circled in accordance with the Wolf award."  Award at 27.

The arbitral record reveals that the creation of new pay bands was intended in part to reflect the

higher salaries that Local 2 employees were already receiving, suggesting that the questions

presented to the Board implicitly included the peopling of the new pay bands.  J.A. 6257.

However, because Local 2 explicitly stated in their arbitration brief that "Local 2 is *not* presently

asking the [Board] in this matter to place any job classifications or individuals in new higher pay

scales," *id.*, the Board exceeded the scope of the issues submitted by the parties.  Although

peopling of the new pay bands might conceivably have fallen within the Board's discretion if the

Union had remained silent on the issue, the Board disregarded Local 2's express disclaimer in

moving the Wolf award incumbents into the new pay grades.  Because this aspect of the Award

"advance[s] to a position beyond the parameters that have been identified by the parties as being

appropriate for resolution of the continuing bargaining dispute[,]" J.A. 5–6 (Arb. Tr. 20:22–21:3,

July 8, 2010), in the face of an express disclaimer, *cf. Runyon*, 185 F.3d at 836, the Court finds it

inappropriate to defer to the Board's understanding of the scope of the issues submitted for

arbitration.  Indeed, the Board even recognized that the Union's pay band proposal was made "in

order to allow the parties, or *subsequent* panels, to seek agreement on placement of increasingly expert and skilled specialized professional employees" in those bands.  Award at 27 (emphasis added).

However, the creation of the pay bands themselves was clearly within the scope of the submitted dispute, as the Union proposed the creation of four new pay bands, and the Board awarded the lower two bands.  *See* J.A. 1200; Award at 27.  In any event, it is not clear that WMATA challenges the creation of the pay bands.  *See* Pet'r's Mem. P. & A. Supp. Mot. Summ. J. 43–44, ECF No. 14-1 (focusing on peopling).  Accordingly, the Court will vacate the peopling of the pay bands, but not the creation of the pay bands themselves.

### 4.  Other Award Provisions

WMATA's Standards Act challenge related to only the three provisions of the Moffett Award discussed above.  The Award also contained several other provisions setting contract terms relating to, among other things, pensions, health insurance, overtime compensation, and the contract duration.  Local 2's counterclaim seeks confirmation of the *entire* Award, including the provisions not challenged by WMATA, on the basis that it withstands scrutiny under the common law review standard, the Federal Arbitration Act, and the Standards Act.  *See* Answer & Countercl. ¶¶ 31–35, ECF No. 5.  For the reasons discussed above, the Standards Act sets forth the applicable legal standard for the entire Moffett Award.  *See supra* Part IV.A.  Because WMATA did not answer Local 2's counterclaim or address the additional Award provisions in its dispositive motion briefing, the Court will treat Local 2's counterclaim to confirm parts B–C, E–G, and I–N of the Moffett Award (i.e., those not challenged in WMATA's petition) as conceded.  *See Harris v. Koenig*, 722 F. Supp. 2d 44, 62 n.11 (D.D.C. 2010).  Accordingly, those provisions are confirmed.

## V.  PRE-JUDGMENT AND POST-JUDGMENT INTEREST

Local 2 seeks both pre-judgment and post-judgment interest, arguing that WMATA, in filing this lawsuit, "seeks to obtain a substantial interest-free loan from its employees."  *See* Resp't's Mem. Supp. Mot. Dismiss Pet. & Conf. Arb. Award 31, ECF No. 13-1.

"[T]here is no . . . legislation regarding prejudgment interest.  Far from indicating a legislative determination that prejudgment interest should not be awarded, however, the absence of a statute merely indicates that the question is governed by traditional judge-made principles."  *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 194 (1995).  "[T]he court orders the interest payments on its own authority.  This is because interest compensates for the time value of money, and thus is often necessary for full compensation.  Even so, whether pre-judgment interest is to be awarded is subject to the discretion of the court and equitable considerations."  *Motion Picture Ass'n of Am., Inc. v. Oman*, 969 F.2d 1154, 1157 (D.C. Cir. 1992) (citation omitted).

The Court finds, based on equitable considerations, that an award of pre-judgment interest is not appropriate here.  First, the Moffett Award's wage terms do not themselves include any provision for pre- or post-Award interest, even though the Award related back to contract years that had already ended.  Second, WMATA did not act frivolously or in bad faith in petitioning this Court for review of the Moffett Award.  The Authority was well within its rights under the Standards Act to appeal, and, as explained above, the Court did find particular aspects of the Award invalid.  Finally, it is not clear—nor has Local 2 affirmatively argued—that confirmation of the Award is compensatory in nature.  *Cf. Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1286 (10th Cir. 2002) ("The district court must first determine whether the award of prejudgment interest will serve to compensate the injured party." (quoting *Eastman Kodak Co.*

*v. Westway Motor Freight, Inc.*, 949 F.2d 317, 321 (10th Cir. 1991))); *Sheet Metal Workers Int'l*

*Ass'n Local Union No. 162 v. B.J. Heating & Air Conditioning*, 695 F. Supp. 485, 491 (E.D. Cal.

1987) (granting pre-judgment in an interest arbitration dispute in which the court found that the

employer breached the awarded CBA). Because there has been no finding that WMATA

inflicted a judicially cognizable injury on the Union—for example, there is no breach of contract

claim in this case—the Court is not inclined to find that confirmation of the Award is sufficiently

"compensatory" to warrant an award of pre-judgment interest.[17]

The Court next turns to the issue of post-judgment interest. The Union's briefing raises

the issue only in passing, in a single sentence without any citation to legal authority. *See*

Resp't's Mem. Supp. Mot. Dismiss Pet. & Conf. Arb. Award 32, ECF No. 13-1. Federal statute

provides that post-judgment interest "shall be allowed on any money judgment in a civil case

recovered in a district court." 28 U.S.C. § 1961(a) (2006). Where applicable, an award of post-

judgment interest under section 1961(a) is mandatory, not discretionary. *See Cont'l Transfert*

*Technique Ltd. v. Fed. Gov't of Nigeria*, 850 F. Supp. 2d 277, 287 (D.D.C. 2012). "[A] money

judgment consists of two elements: '(1) an identification of the parties for and against whom

judgment is being entered, and (2) a *definite* and *certain* designation of the amount which

plaintiff is owed by defendant.'" *Ministry of Def. & Support for the Armed Forces of the Islamic*

*Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1101 (9th Cir. 2011) (quoting *Penn*

*Terra Ltd. v. Dep't Envtl. Res.*, 733 F.2d 267, 275 (3d Cir. 1984)).

---

[17] Under the terms of the Standards Act, the Moffett Award became binding 10 days after
it was handed down, and the parties had a duty to implement it at that time. *See* 40 U.S.C.
§ 18304(a)–(b) (2006); *see also id.* § 18304(c) (providing for judicial review of arbitration
awards *after* the award becomes binding, but containing no explicit provision for a stay of
enforcement). The Court sees nothing that prevented the Union from seeking enforcement of the
Award at that time, which would have obviated the need to seek pre-judgment interest here.
Because the parties only filed claims seeking vacatur or confirmation of the Award, the question
of enforcement is not properly before the Court.

Although a judgment confirming an arbitration award may constitute a "money judgment" under section 1961(a) even if the judgment merely confirms the award and does not specify a dollar amount, *see Cont'l Transfert Technique*, 850 F. Supp. 2d at 287 & n.6, the case law awards post-judgment interest in such situations where a "definite and certain designation of the amount [owed] is readily discernible by looking to the arbitration award itself." *Ministry of Def.*, 665 F.3d at 1101. The amount owed under the Moffett Award, however, is not "readily discernible" on its face; the Award merely establishes a CBA that, in part, provides for general wage increases. *See* Award at 6; *cf. Cont'l Transfert Technique*, 850 F. Supp. at 281, 288 (confirming an award of $250,522,787.84); *Ministry of Def.*, 665 F.3d at 1101 (confirming an award of $2,808,591). Neither the Award itself nor the Union's cursory argument in favor of post-judgment interest describes the staffing levels for each grade (which have undoubtedly changed due to natural turnover during the pendency of this litigation) or the corresponding base salaries. Without this information, it is unclear how the Court and the Clerk's Office are expected to calculate interest. The Court will therefore deny Local 2's request for post-judgment interest.

## VI. ATTORNEYS' FEES

Local 2 also seeks attorneys' fees. *See* Resp't's Mem. Supp. Mot. Dismiss Pet. & Conf. Arb. Award 32–33, ECF No. 13-1. Under the "American Rule," each party bears its own fees absent an express statutory authorization to the contrary. *See Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). The Standards Act contains no such authorization. Nonetheless, courts possess an inherent power to award attorneys' fees, unless explicitly forbidden by Congress, "when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . . .'" *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59 (1975) (alteration in

original) (quoting *F.D. Rich Co. v. U.S. for the Use of Indus. Lumber Co.*, 417 U.S. 116, 129 (1974)).  A court may exercise this power if it finds "that the losing party's actions were 'frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.'"  *Wash. Hosp. Ctr. v. Serv. Emps. Int'l Union, Local 722*, 746 F.2d 1503, 1510 (D.C. Cir. 1984) (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978)).

The Union argues that WMATA initiated this litigation in bad faith in order to "re-arbitrate," under a very narrow standard of review, arguments that already failed before other courts.  *See* Resp't's Mem. Supp. Mot. Dismiss Pet. & Conf. Arb. Award 33, ECF No. 13-1. That argument is unavailing for several reasons.  First, for the same reasons explained above in the context of collateral estoppel, the Maryland court considered a different factual basis, dealing with a different union and written award, and WMATA was not foreclosed from raising similar—or even identical—arguments in this case.  *See supra* Part III.  Second, as also noted above, the Moffett Award does not satisfy the arbitrary or capricious standard of review by a particularly wide margin.  *See supra* Part IV.B.2.b.  WMATA was therefore not acting frivolously in challenging the general wage adjustments in this Court.  Finally, the Court's finding that the Board exceeded its authority in peopling the new pay bands indicates that WMATA's section 18304(c)(2) argument was neither frivolous nor unreasonable.  The Court will deny Local 2's request for attorneys' fees.

## VII.  CONCLUSION

For the foregoing reasons, the Court will vacate the provision of the Moffett Award that assigns Local 2 employees to the newly created pay bands, but will confirm the remainder of the Award, including the creation of the new pay bands themselves.  The Court will deny the

Union's request for pre-judgment interest, post-judgment interest, and attorneys' fees. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:    August 30, 2013                              /s/ Rudolph Contreras
                                                        RUDOLPH CONTRERAS
                                                        United States District Judge